## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: BLUE BEAR FUNDING LLC, f/k/a 1st American Factoring, LLC, a Colorado limited liability company; | ) ) ) ) | Case No. 05-31300 ABC |
| EIN:  20-0063205 | ) ) | Chapter 11 |
| Debtor. | ) ) | |

| | | |
|---|---|---|
| BLUE BEAR FUNDING, LLC, f/k/a 1ST AMERICAN FACTORING, LLC, a Colorado limited liability company; and | ) ) ) ) | |
| THE OFFICIAL UNSECURED CREDITORS' COMMITTEE; | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DAVID KARST, an individual; DK CORPORATION d/b/a NATIONWIDE CASH FLOW SPECIALISTS, a Colorado limited liability company; KFG, LLC, a Colorado limited liability company; | ) ) ) ) ) ) | Adversary Proceeding No. 06-_____ |
| ASPEN BUSINESS GROUP, LLC, a Colorado limited liability company; RUSSELL DISBERGER, an individual; STEVEN P. SHORT, an individual; BLUE BEAR FINANCIAL, INC., a Colorado corporation; | ) ) ) ) ) ) ) | |
| DONALD L. DONAHOO, an individual; KRISTINE R. DONAHOO, an individual; D & K, LLC, a Colorado limited liability company; DKD CONNECTIONS, LLC, a Colorado limited liability company; GERALD W. MAKEY, an individual; PEGGY MAKEY, and individual; KEY CONNECTIONS, LLC, a Colorado limited liability company; and | ) ) ) ) ) ) ) ) ) ) ) ) | |
| RICKARDS, LONG & RULON, LLP, a Colorado limited liability partnership; SCOTT RULON, an individual; | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Blue Bear Funding, LLC, f/k/a 1ˢᵗ American Factoring, LLC, a limited liability company ("Blue Bear"), by its counsel, Jessop & Company, P.C., and the Official Unsecured Creditors' Committee (the "Committee"), by its counsel, Holland & Hart LLP, for their Complaint, state as follows:

## INTRODUCTION

Blue Bear and the Committee bring this suit on behalf of approximately 450 investors, many of them elderly, who together invested over $20,000,000 in a business operation now uncovered to be a Ponzi scheme. The "business" was created by its principals in order to circumvent securities registration laws violated by them in a predecessor business. It was insolvent from inception and plunged further into debt with each additional investment, incompetent management and operation, and continuing illicit and improper insider transactions.

Blue Bear's managers breached their duties to Blue Bear and its creditors by, among other transgressions, failing to disclose the dire state of its financial affairs. Complicit in these breaches, Blue Bear's auditors facilitated continuing and prolonged investments in Blue Bear, when they knew or should have known that Blue Bear was deepening its insolvent path.

Plaintiffs seek to recover losses suffered by creditors and Blue Bear's bankruptcy estate which resulted from the many breaches, wrongdoings and outright fraud committed by Blue Bear's insiders and professional advisors.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to the provisions of 28 U.S.C. §§ 1334(b) and 157, and 11 U.S.C. §§ 105(a), 502(d), 541, 544, 547, 548, 550 and 551. This proceeding is commenced pursuant to Fed. R. Bankr. P. 7001 *et seq*.

2.      This proceeding is a core proceeding under the provisions of 28 U.S.C. 157(b)(2)(A), (F), (H) and (O). Venue is proper in this Court pursuant to the provisions of 28 U.S.C. §§ 1408 and 1409.

## PARTIES

**Plaintiffs**

3.      Blue Bear is a factoring company that provides working capital for business borrowers ("Clients") primarily by purchasing the Clients' accounts receivable invoices ("Accounts"). It has a principal place of business located at 541 East Garden Drive, Unit R, Windsor, Colorado 80550. On August 22, 2005 (the "Petition Date"), Blue Bear filed a voluntary petition under chapter 11 of title 11 of the United States Code, and is currently a debtor in possession (the "Bankruptcy Case").

2

4.      Blue Bear is comprised of four member managers: (a) Blue Bear Financial, Inc., with a forty-five percent (45%) membership interest, whose principals are Steve Short and Russell Disberger; (b) KFG, LLC, with a forty-five percent (45%) membership interest, whose principal is David Karst; (c) DKD Connections, LLC, with a five percent (5%) membership interest, whose principals are D&K, LLC, and Kristine and Donald Donahoo; and (d) Key Connections, LLC, with a five percent (5%) membership interest, whose principals are Margaret and Gerry Makey.

5.      Blue Bear brings this action on behalf of itself and as an assignee of certain claims of the following Independent Factoring Companies: Empire Factoring, LLC; IHS Factoring; Provision Factoring, LLC; Return on Investment Capital, LLC; SAGE Factoring, LLC; Sunflower Factoring, LLC; and Willow Factoring, LLC (the "Assigning IFCs").

6.      Effective August 14, 2006, and pursuant to an Agreement to Settle Controversy approved by Court Order dated August 4, 2006 (the "IFC Settlement"), the Assigning IFCs assigned to Blue Bear and the Committee all of their claims of any nature whatsoever pertaining in any manner to (a) Blue Bear or its projected successor, Reorganized Blue Bear; (b) the members of Blue Bear and the principals of such members; (c) any insiders or affiliates of Blue Bear, including without limitation, any claims related to the HTI Notes (as defined therein); (d) any other entity or individual in any other way associated with any insiders of Blue Bear; and (e) certain prepetition professionals engaged by Blue Bear or the Assigning IFCs, including their prepetition accountants and attorneys.

7.      The Committee was appointed and established on October 17, 2005, by the U.S. Trustee, pursuant to 11 U.S.C. § 1102(a).   The Committee consists of the following six unsecured creditors of Blue Bear:  Anthony J. Espinoza, John H. Miller; Richard D. Brighi, Lee Sommers, Kenneth F. Reither and Dell Babbitt.  Messrs. Espinoza, Brighi and Babbitt are among the top twenty largest unsecured creditors of Blue Bear.

8.      The Committee, in addition to representing the interests of all unsecured creditors in the Bankruptcy Case, brings this action on behalf of the estate, as an assignee of the Assigning IFCs, and also as the direct assignee of the claims of certain creditor investors listed on Exhibit A hereto and such other creditor investors as may subsequently assign their claims to the Committee (the "Assigning Investors").  The claims assigned to the Committee by the Assigning Investors include their claims, demands, suits, damages, remedies, and causes of action of whatsoever kind and nature, which they would otherwise be entitled to assert against Blue Bear, its principals and certain other related parties who assisted in the formation of Blue Bear, the solicitation of capital for its business, the operation of its business, the disbursement of funds from Blue Bear, and/or who received payments from Blue Bear and/or parties related to it in violation of the law.

**Defendants**

9.      David Karst ("Karst") is an individual currently residing at 1312 Mary Circle, Fort Collins, Colorado, 80524.  At all relevant times, Karst was the sole member of Defendant DK Corporation d/b/a Nationwide Cash Flow Specialists and Defendant KFG, LLC.

10.     DK Corporation d/b/a Nationwide Cash Flow Specialists ("NCFS") is a Colorado limited liability company with its principal place of business located at 501 Main Street, Windsor Colorado 80550.  NCFS' sole member is Defendant Karst.

11.     KFG, LLC ("KFG"), is a Colorado limited liability company with its principal place of business located at 501 Main Street, Windsor Colorado 80550.  KFG's sole member is Defendant Karst and KFG is a forty-five (45%) member of Blue Bear.

12.     Defendants Karst, NCFS and KFG are collectively referred to as the "Karst Group."

13.     Russell Disberger ("Disberger"), is an individual residing at 439 Stagecoach Lane, New Castle, Colorado 81647.  Disberger is the sole member of Defendant Aspen Business Group, LLC, and is also a shareholder and officer of Defendant Blue Bear Financial, Inc.

14.     Aspen Business Group, LLC ("Aspen"), is a Colorado limited liability company with it principal place of business located at 439 Stagecoach Lane, New Castle, Colorado 81647. Aspen's sole member is Defendant Disberger.

15.     Steven P. Short ("Short"), is an individual residing at 7000 E. Beechcraft Lane, Wasilla, Alaska 99654.  Defendant Short is a shareholder and officer of Defendant Blue Bear Financial, Inc. and a former resident of Colorado.

16.     Blue Bear Financial Inc. ("BBFI"), is a Colorado corporation with its principal place of business located at 439 Stagecoach Lane, New Castle, Colorado 81647.  Defendant BBFI is a forty-five percent (45%) member of Blue Bear.

17.     Defendants Disberger, Aspen, Short and BBFI are collectively referred to as the "BBFI Group."

18.     Donald L. Donahoo and Kristine R. Donahoo, husband and wife (collectively, the "Donahoos") are individuals residing at 5105 Nelson Court, Fort Collins, Colorado 80528.  The Donahoos are sole members of Defendant D & K, LLC.

19.     D & K, LLC ("D&K"), is a Colorado limited liability company with its principal place of business located at 5105 Nelson Court, Fort Collins, Colorado 80528.  Defendant D&K is a one hundred percent (100%) member of Defendant DKD Connections, LLC.

20.     DKD Connections, LLC ("DKD Connections"), is a Colorado limited liability company with it principal place of business located at 5105 Nelson Court, Fort Collins, Colorado 80528.  Defendant DKD Connections sole member is Defendant D&K, and Defendant D&K Connections is a five percent (5%) member of Blue Bear.

21.     Gerald W. Makey and Peggy Makey, husband and wife (collectively, the "Makeys"), are individuals residing at 39367 Ridgepark Drive, Severance, Colorado 80546. The Makeys are the sole members of Defendant Key Connections, LLC.

22.     Key Connections, LLC ("Key Connections"), is a Colorado limited liability company with it principal place of business located at 525 White Willow Drive, Building O, Unit 230, Fort Collins, Colorado 80528.  Defendant Key Connections' sole members are the Makeys, and Defendant Key Connections is a five percent (5%) member of Blue Bear.

23.     Key Connections, DKD Connections, D&K, the Makeys and the Donahoos are collectively referred to as the "Senior Consultants."

24.     Rickards, Long & Rulon, LLP ("Rulon"), is a Colorado limited liability partnership with its principal place of business located at 301 East Olive, Fort Collins, Colorado 80524.  Rulon is an accounting firm providing audit and other accounting services.

25.     Scott Rulon is an individual residing at 3301 Silver Oaks Place, Ft. Collins, Colorado  80526, and is a partner in Rulon.

26.     Defendants Rulon and Scott Rulon are collectively referred to as the "Rulon Group."

## GENERAL ALLEGATIONS

**NCFS and the Origins of Blue Bear**

27.     NCFS was a business created by David Karst.  Prior to NCFS, Karst was the branch manager of a heavy equipment dealership in Fort Collins.  He subsequently became the owner of a dry cleaning business.  In 1996 he sold the dry cleaning business assets and changed the name of the corporation to NCFS.

28.     In May of 1996, Karst took an eight-day course in a form of financial investment called factoring.  Factoring is the process of purchasing commercial accounts receivable (invoices) from a business at a discount.  Factoring is a way of providing working capital for businesses that may not qualify for typical accounts receivable financing from banks.

29.     After his factoring course, Karst attempted to develop NCFS into an investment and factoring company.  Karst contributed his own money and raised additional money from both individual and entity investors.  In return for an investment, the NCFS investor would receive a promissory note from NCFS with a 12% to 18% annual interest rate.  Some of the entity investors would in turn raise money to invest in NCFS by issuing their own promissory notes to their investors.  These promissory notes were "securities" as defined under applicable state and federal securities laws.  As such, the issuer was required to comply with applicable securities registration requirements absent specific exemptions.

30.     NCFS engaged in more than the purchase of invoices.  It also made and purchased loans and notes.  As NCFS expanded with its promised high returns, the job of raising money became more involved.  Various "investment clubs" and other investor groups were contacted or organized to obtain funding for NCFS.  As the number of investors increased, so did the securities law issues because the ability to offer securities in a private placement, as opposed to a public placement, was no longer available.

31.     Two of the key NCFS investor groups were led, managed and brokered by the Makeys and the Donahoos.

32.     Sometime in 2003, problems arose with some of the investors in both NCFS and the entities and persons investing in NCFS.  Upon information and belief, the Makeys, the Donahoos and other individual investors became concerned about potential securities law violations in connection with NCFS' securities offerings to investors and possible investigations thereof by the Securities and Exchange Commission.  Specifically, the parties were concerned about having violated provisions of state and federal securities laws requiring that securities offerings be registered, in the absence of a valid exemption, and the availability of certain "safe harbor" provisions limiting the sale of securities to only thirty-five non-accredited investors.

33.     Defendants Karst, the Makeys, the Donahoos, Short and Disberger, as well as third parties Virginia Brinkman and Darrin Devoe, created the Blue Bear organization in 2003 ostensibly to address the securities laws issues.

**Blue Bear and the IFCs**

34.     Blue Bear was to be the factoring service company which helped other factoring companies.

35.     The above Defendants and other parties, through Blue Bear, created approximately thirteen limited liability companies designed as "Independent Factoring Companies" ("IFCs"), each primarily with one member/manager known as an "Executive Director."  Under such mechanism, it was thought that each of the IFCs ostensibly could solicit thirty-five non-accredited investors and an unlimited number of accredited investors, and were thus exempt from registration requirements under certain federal and state securities laws.  However, as discussed elsewhere herein, the IFCs were under common control, effectively operated as a single securities issuer, and the safe harbor provisions did not apply.

36.     Each of the IFCs issued short term promissory notes to their investors.  Most of the promissory notes were for ninety to 360 day terms with interest at twelve percent (12%) per annum.  Investors were given the choice of receiving interest monthly, accruing interest or "rolling" the investment and interest over for another ninety to 360 days.

37.     For most of the time and with limited exceptions, the IFCs were not truly independent.  Blue Bear performed all of the tasks of the factoring and fundraising business and during all relevant periods, dominated and controlled the IFCs.  In particular, Blue Bear paid for the IFCs' audit fees and directed Rulon to send it audit opinions for the IFCs' financial statements.

38.     As part of the factoring business, Blue Bear found the Clients, purchased the Accounts, performed limited due diligence, established the IFCs, designated the Executive Directors, did all the accounting, co-mingled all of the investor and Client funds in one bank account, controlled the bank accounts of the IFCs, wrote all checks to the IFCs and their investors, did all of the paperwork, collected and enforced all Accounts in its own name and generally conducted the business as a single business enterprise.

39.     As of the Petition Date, there were nine IFCs, down from an historical high of thirteen IFCs.  These nine IFCs had, in the aggregate, approximately 450 individual and organizational accredited and non-accredited investors.  These IFCs are: Empire Factoring, LLC; IHS Factoring, LLC; Midwest Factoring, LLC; Provision Factoring, LLC; Return on Investment Capital, LLC; SAGE Factoring, LLC; Sierra Factoring, LLC; Sunflower Factoring, LLC; and Willow Factoring, LLC.

**The Capitalization of Blue Bear**

40.     Over a period of months beginning in December of 2003, NCFS transferred certain of its loans and factoring assets to Blue Bear and/or the Initial IFCs (defined below) and/or Blue Bear (the "Transferred Assets").  At the same time, many investors (and the debt owed by NCFS to such investors) were also transferred from NCFS to various IFCs (the "Transferred Debt").  Most of the Transferred Assets were non-performing loans.  The Transferred Assets appear to have been placed on the books of Blue Bear at face value (i.e., at a value approximating the amount loaned or paid by NCFS).  On information and belief, no attempt was made to actually value the Transferred Assets.  Instead, the Transferred Assets were placed in the books of Blue Bear and the Initial IFCs at a value equal to the Transferred Debt (about $7,000,000).

41.     The fair value of the Transferred Assets was a small fraction of the Transferred Debt assigned to Blue Bear.  For example, the following loans and/or accounts receivable were non-performing at the time of the transfer (amount reflects approximate alleged face value of the Transferred Asset at the time of the transfer):

> a.     Global Builders, Inc. - $608,564.00.
>
> b.     Theatrix - $875,268.00.
>
> c.     Women's Interactive Network - $187,255.65
>
> d.     Athenian Gardens - $1,184,486.00
>
> e.     Montana Development, LLC - $602,571.64.

42.     When the NCFS transfers were completed sometime in the early part of 2004, Blue Bear had assets worth far less than $7,000,000 and liabilities greater than $7,000,000 in the form of obligations to the IFCs.  In turn, the IFCs held assets in the form of obligations from Blue Bear worth far less than $7,000,000 while their total liabilities to creditors were greater than $7,000,000.

43.     Blue Bear was insolvent from its inception and at all times thereafter.  The "Initial IFCs," being Empire Factoring, LLC; Return on Investment Capital, LLC; Willow Factoring, LLC; Provision Factoring, LLC; and HIS Factoring, LLC, were insolvent from inception.  Due to the immediate insolvency of Blue Bear and the Initial IFCs, Blue Bear's member/managers had a heightened and direct duty to creditors, whose investments were in obvious peril from the outset.  Funds raised from investors totaled over $20,000,000.

44.     After its formation, Blue Bear did attempt to make investments including buying commercial invoices and making loans.  These efforts required the funds of many investors.

45.     From December 2003 to at least August of 2005, Blue Bear's revenues from the Transferred Assets and Blue Bear's subsequent investments (the "Additional Assets"), were wholly insufficient to make payments to vendors, IFCs and investors.  Investor funds were therefore used to make such payments. The Transferred Assets and the Additional Assets are hereinafter referred to as the "Assets."

46.     In short, Blue Bear operated, in part, as a Ponzi scheme.  In other words, Blue Bear was a fraudulent investment operation that paid returns to investors out of the money raised from other investors, rather than from profits generated by any real business.

**The HTI Notes**

47.     The Transferred Assets included the following three Accounts: Harlem Ambassadors, Inc., Theatrix, Inc. and Impel Strategic Solutions, Inc. (the "HTI Accounts").  In the later part of 2004, it came to the attention of the IFCs that the HTI Accounts were significantly impaired.  The total amount due from these Clients at that time was $2,337,143, including interest and fees.  Karst promised the IFCs that he and NCFS would buy back the HTI Accounts and make the IFCs, investors and Blue Bear whole.

48.     On March 4, 2005, Silver Mountain Financial, LLC, an entity which is an affiliate of Blue Bear, deposited $900,000 into Blue Bear's bank account.  The IFCs understood that these funds would be divided among all the current IFCs on a pro rata basis as a partial payment on the HTI Accounts.  Instead, on March 7, 2005, Karst caused $887,000 of these funds to be transferred to Sierra Factoring, LLC, one of the IFCs.  Little if any other funds were subsequently paid to the IFCs on account of the HTI Accounts.

49.     By May 2005, the other IFCs and Blue Bear insisted that Karst take immediate action to rectify this situation.  On May 30, 2005, Karst and NCFS executed a series of promissory notes (the "HTI Notes") to all the existing IFCs except Sierra Factoring, LLC. The HTI Accounts were then transferred by Blue Bear to Karst and NCFS, purportedly in exchange for the HTI Notes.

50.     The interest rate on the HTI Notes is fifteen percent (15%) per annum, which was payable monthly to such IFCs.  The maturity date was November 30, 2005.  Karst and NCFS have not paid the principal balance of the HTI Notes and little, if any, of the accrued interest. Accordingly, each of the HTI notes is currently in default.  The HTI Notes are described below:

//


//

| Payee | Principal Amount |
|---|---|
| Empire, LLC | 214,747.77 |
| IHS Factoring, LLC | 424,319.47 |
| Midwest Factoring, LLC | 126,590.81 |
| Provision Factoring, LLC | 444,426.30 |
| Return on Investment Capital, LLC | 530,475.37 |
| SAGE Factoring, LLC | 127,958.83 |
| Sunflower Factoring, LLC | 144,752.58 |
| Willow Factoring, LLC | 303,187.86 |
| **Total** | **2,316,458.99** |

51.    Pursuant to the IFC Settlement, all of the above IFC payees (except Midwest Factoring, LLC, who was not a party to the IFC settlement), (collectively, the "IFC Noteholders") assigned their respective notes to Blue Bear.

**Blue Bear's Operations**

52.    Blue Bear, pursuant to its factoring business, typically advances seventy to eighty percent (70% to 80%) of the face amount of an Account, collects the full amount of the Account, subtracts its advances and fees, and then remits any remainder to the Client.

53.    Initially, when Blue Bear found an invoice to factor, Karst generally assigned a percentage of the invoice among the IFCs.  Subsequently, Blue Bear issued an ambiguous document entitled "Bill of Sale and Security Agreement" to the IFCs that indicated the percentage of the purchased invoice that Blue Bear purportedly purchased with an IFC's funds. Money from the IFCs' investors would be transferred to Blue Bear and Blue Bear would advance the money to the Client as part of Blue Bear's purchase of the Account.

54.    No actual Accounts were ever transferred to any individual IFC.  No losses on Accounts were ever allocated to the IFCs.  Few if any Clients even knew of the existence of the IFCs.  All funds from investors, IFCs and Clients were commingled in Blue Bear's bank accounts.

55.    Blue Bear's fees to Clients initially ranged from one percent (1%) to three percent (3%) of the total Account plus one and one half percent (1.5%) for every fifteen (15) days the Account was outstanding.

56.    Pursuant to a Support Services Agreement with each IFC (an "IFC Support Agreement"),  Blue Bear was required to provide the IFCs with factoring support services including the identification of potential Clients, negotiation of factoring and other debt financing agreements, due diligence review of potential Clients, collection of debts represented by the Accounts, and foreclosure of debts where necessary.

57.    Under the IFC Support Agreements, Blue Bear provided the IFCs with a business plan, business guidelines and policies, a private placement memorandum for investors,

9

fundraising instruction and support, organizational documents, initial books and records; established their bank accounts; and provided alleged "expert" advice and accounting services.

58.     As compensation, the IFC Support Agreements entitled Blue Bear to keep twenty-five percent (25%) of all fees and then remit the seventy-five percent (75%) balance to the IFCs. Blue Bear was also eligible for enhanced fees based on performance.  The IFCs in turn paid interest to their investors as and when required or demanded and paid their Executive Directors from any "profits."

59.     After March of 2005 and prior to the Petition Date, the process used by Blue Bear and the IFCs for funding the factoring of Accounts changed.  Rather than being assigned a percentage of an Account, an IFC would decide whether or not to fund a specified Account.  If so determined, Blue Bear and each IFC executed an inaptly named document entitled "Bill of Sale and Security Agreement" (the "Account Agreement") which identified, among other things, the Client's name, Account number and invoice amount, and the maximum amount which the IFC was willing to fund. The IFC advanced the specified funds to Blue Bear and the Account Agreement was modified to reflect such advance.

60.     Notwithstanding the "factoring" purposes of Blue Bear, Blue Bear continued to make or acquire loans in addition to its factoring activities subsequent to the conveyance of the Transferred Assets.

**Management**

*Karst*

61.     From October 27, 2003, though August 25, 2005, Karst was the Executive Director of Blue Bear pursuant to an Employment Agreement dated October 6, 2003 (the "Employment Agreement").   Karst, pursuant to the Employment Agreement, had lead responsibility for the operations of Blue Bear, including (a) the management of all Blue Bear employees; (b) strategic planning and implementation; (c) the sale of factoring services; (d) the negotiation, implementation and monitoring of contracts for vendor services; and (e) the preparation of polices, procedures and systems for conducting Blue Bear's business (the "Karst Services").

62.     Karst was required to manage the operations of Blue Bear in such a manner that Blue Bear would realize a profit after payment of all monies to the investors.  Accordingly, Karst was responsible for the financial health of Blue Bear.

63.     Per his Employment Agreement, Karst purportedly received a commission ranging from six percent (6%) to eight percent (8%) based on certain gross earnings formulas.

64.     Karst controlled the disbursements of funds to Clients and the IFCs and made investment decisions.  Blue Bear did have an investment committee (which was formed around October 2004) whose function was to review and approve funding and other investment decisions.  However, upon information and belief, Karst would regularly invest and direct Blue Bear's funds without consulting such committee, and oftentimes other members and officers of

Blue Bear discovered that a transaction had been made or funds disbursed after it had already been completed.

65.     Karst also worked closely with the IFCs.  Karst, among other things, generally prepared the monthly earning statements for each IFC, and determined (until the system was changed in March 2005), the percentage each IFC would receive in the Accounts and loans.

*Aspen/BBFI*

66.     Disberger initially helped structure Blue Bear and the IFCs though his consulting company, Aspen.  In 2003, Aspen/Disberger suggested the investment structure and attended meetings with potential investors to provide information about the formation and structure of the IFCs and Blue Bear.

67.     BBFI also played a role in the management of Blue Bear.  On or about October 23, 2003, BBFI entered into a Support Services Agreement with Blue Bear (the "BBFI Agreement").  Pursuant to such agreement, BBFI provided consulting services to Blue Bear regarding business strategy and operations.

68.     BBFI selected and installed Blue Bear's accounting system, handled all human resource functions, assisted in the due diligence of selected prospective Clients and selected Rulon as Blue Bear's auditors. In mid-September, Frank Clark became Chief Operating Officer and assumed certain management responsibilities of BBFI.

69.     Under the BBFI Agreement, BBFI's compensation was three percent (3%) of Blue Bear's gross revenues.  From time to time, BBFI and/or Short and Disberger took excessive "advances" on such compensation.

*Key Connections and DKD Connections*

70.     Key Connections and DKD Connections provided services to Blue Bear under two separate arrangements.

71.     Initially, Key Connections and DKD Connections entered into certain Senior Consultants Agreements with Blue Bear effective December 1, 2003.  Under such agreements, the primary role of Key Connections and DKD Connections was generally to facilitate the transition of many investors in their investment groups from NCFS to Blue Bear/IFCs, monitor the investor services and recruit new investors.  Key Connections and DKD Connections each received consideration of $5,000 per month, plus fees ranging from one percent (1%) to three percent (3%) of IFC earnings attributable to funding from investors introduced by them.  These agreements terminated August 1, 2004.

72.     Effective August 1, 2004, Key Connections and DKD Connections entered into Services Agreements with Blue Bear (the "Services Agreements").  Under such agreements, the primary role of Key Connections and DKD Connections was to assist in the creation and overall operation of Blue Bear and in the provision of services to the IFCs.

73.     Specifically, Key Connections and DKD Connections were, among other things, required to (a) contact legal counsel or others to establish Blue Bear and IFC guidelines, polices and procedures concerning various legal requirements; (b) assist Blue Bear's then management in finalizing Blue Bear's structure and strategizing the direction and future of the business; (c) establish new IFCs and identify prospective IFC Executive Directors; (d) support the IFCs in raising investor capital; and (e) act as liaisons between Blue Bear and the IFCs (the "Consulting Services").

74.     Upon the effective date of the Services Agreements, Key Connections and DKD Connections each received five percent (5%) equity in Blue Bear as well as base monthly fees of $15,000.  Although the agreements were executed in September of 2004, Key Connections and DKD Connections began receiving the $15,000 base monthly fees in August of 2004.

*Subsequent Management Changes*

75.     Due to the perceived growth of Blue Bear, Blue Bear hired Frank Clark, an accountant, to be Blue Bear's Chief Operating Officer (COO) commencing September 15, 2004. Mr. Clark's responsibilities were primarily management of all office personnel, completion of the 2003 audit, preparation of Blue Bear's monthly financial statements, assistance in the assessment of new business opportunities, and creation of corporate policies and procedures.

76.     On or around October 2004, John Davis, Blue Bear's COO, was hired by Karst as a broker to help Blue Bear increase its factoring portfolio.  His responsibilities consisted primarily of soliciting new factoring Clients and performing due diligence on new Accounts. Mr. Davis continued in this position through approximately late-January 2005.

**Rulon's Audits of NCFS, the IFCs and Blue Bear**

77.     The securities registration safe harbor purportedly relied upon by the IFCs required them to provide investors with audited financial statements.  Accordingly, in November of 2003, principals of Blue Bear arranged for Rulon to audit the financial statements of the Initial IFCs.

78.     Rulon decided to provide audited financial statements only for the one day ended November 10, 2003, the date of inception for each Initial IFC.  These financial statements listed only $100 in assets and members capital for each IFC.  Upon information and belief, this decision was made deliberately to avoid disclosing the suspect value of the Transferred Assets transferred from NCFS to the Initial IFCs.

79.     The engagement letters were dated November 10, 2003 or November 12, 2003 and were signed by Scott Rulon.[1]

---

[1]   At least two of these engagement letters were dated November 12, 2003, but this date was crossed out and replaced by November 10, 2003.  On information and belief, these engagement letters were backdated.  At Scott Rulon's direction, Disberger signed engagement letters for the Initial IFCs, even though he was not an authorized officer or agent of any IFC.

80.     The engagement letters stated that Rulon would perform the following audit procedures:  "tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of inventories, and direct confirmation of receivables and certain other assets and liabilities by correspondence with selected customers, creditors, and financial institutions."   The letters further stated that "We will also request written representations from your attorneys as part of the engagement . . . ."

81.     In connection with their solicitations of funds from investors, the IFCs issued Confidential Private Placement Memoranda ("PPMs") offering private investments in the form of promissory notes.  Rulon and Scott Rulon consented to the inclusion of Rulon's "Independent Audit Report" in the PPMs for the Initial IFCs, which were dated November 1, 2003.  Rulon and Scott Rulon therefore knew that the audit opinions would be provided to, and relied upon by, investors.

82.     PPMs for the Initial IFCs' offerings of promissory notes, including the financial statements and Rulon audit opinions, were distributed to investors during December 2003 and thereafter.

83.     When the IFC engagement letters were signed, Scott Rulon told Disberger that he would try to have the audits done within six days.   However, Rulon issued unqualified "independent" audit opinions purportedly dated November 11, 2003 – no more than one day after Rulon was engaged by the IFCs – stating that the financial statements "[presen[ted] fairly" each of the Initial IFCs financial condition "in conformity with generally accepted accounting principals [GAAP"] and "[w]e conducted our audit in accordance with United States generally accepted auditing standards [GAAS]."

84.     On or about January 23, 2004, Rulon was engaged by NCFS to audit NCFS' financial statements for the year ending December 2003, including an undertaking to "confirm all cash and investment balances as of December 31, 2000, 2001 and 2002."  The engagement letter was again signed by Scott Rulon.

85.     On or about February 2004, Blue Bear retained Rulon to perform an audit of Blue Bear's financials as of December 31, 2003.  This engagement letter was also signed by Scott Rulon.  On February 27, 2004, the Initial IFCs and other recently formed IFCs (the "Remaining IFCs") engaged Rulon to perform an audit of their December 31, 2003 financial statements.

86.     Upon information and belief, Scott Rulon supervised, or was otherwise responsible for, the performance of the IFC "audits," and approved, or authorized issuance of, the resulting audit opinions.

87.     In fact, for those audits which Rulon completed, Rulon performed few, if any, of the audit steps described in Paragraph 80 and did not otherwise conduct an audit of the IFCs' financial statements in conformity with GAAS.

88.     For example, upon information and belief, Rulon and Scott Rulon (a) did not adequately plan the audit field work; (b) did not prepare audit documentation in sufficient detail to provide a clear understanding of the work performed, including the nature, timing, extent, and

results of audit procedures performed; and (c) failed to obtain management representation or attorney letters.

89.    The IFCs' financial statements did not comply with GAAP.  The accounting books and records of the Initial IFCs were nonexistent or incomplete, such that there was no valid basis for preparation of the financial statements.  Further, the financial statements did not disclose material subsequent events that occurred before the financial statements and auditor's opinions were issued to prospective investors.

90.    The statements in the audit opinions that the audits complied with GAAS and that the financial statements complied with GAAP were false.  Scott Rulon knew, or was reckless in not knowing, that these statements were false, or failed to exercise reasonable care and competence in making these statements.

91.    Rulon did not complete the audits of Blue Bear or the IFCs for the year ending December 31, 2003 because, among other things, it was unable to obtain adequate documentation.  However, the limited documents that Rulon and Scott Rulon did obtain indicated that investments in the IFCs and Blue Bear were unsecured and imperiled since:  (a) the accounting books and records of all of these entities were nonexistent, incomplete or in disarray; (b) the Transferred Assets were overvalued; (c) the majority of the loans and Accounts constituting the Transferred Assets were either non-performing or impaired; (d) the Transferred Debt was substantial; (e) the IFCs had incurred substantial debt through the issuance of their promissory notes; and (f) all of these entities had minimal revenues, net income and cash flow.

92.    However, the Rulon Group failed to disclose to investors, the IFCs or Blue Bear these adverse facts.

93.    In the Spring of 2004 and as late as June of 2004, Rulon continued to issue unqualified "independent" audit opinions for the Remaining IFCs which also purported to reflect audits of the financial statements of each such IFC for the one day ended the date of inception of each of the Remaining IFCs.  These audit opinions were also attached to the PPMs by which such IFCs raised capital during the year 2004.  Rulon consented to the inclusion of its opinions in the PPMs for the Remaining IFCs, and continued to do so through at least June of 2004.

94.    Rulon did not complete the audits of the IFCs' December 31, 2003 financial statements.  Further, Rulon did not complete the audit of Blue Bear's December 31, 2003 financial statements.  On or about May 18, 2005, Blue Bear terminated Rulon's services.

95.    Rulon knew or should have known that the IFCs and Blue Bear were insolvent from inception.  Rulon failed to disclose this material fact, omitted any such disclosure from its audit opinions and, on information and belief, conspired with the members of Blue Bear and their principals to conceal this salient fact from investors.

96.    Events Leading to the Chapter 11 Filing

97.    On or around December 2004, Blue Bear was having significant cash shortages and the IFCs were requesting financial statements from Blue Bear which they had never received.

98.     On or about January 26, 2005, after the departure of Mr. Clark, Mr. Davis became COO of Blue Bear.  He was charged by Blue Bear's members with the following primary tasks: working with Rulon to get the 2003 audit finished and creating and installing a system of office-type procedures.  At that time, Mr. Davis did not have responsibility for overall fiscal management and planning or IFC relations.  Karst continued in his existing role as to those matters.

99.     Soon after Mr. Davis became COO, he became concerned about certain operational and financial issues.  These issues included the following:

a.     The Client files were incomplete, including a lack of information on Blue Bear's security interests or lien positions.

b.     The IFC monthly earnings statements prepared primarily by Mr. Karst on an accrual basis did not reconcile to the existing accounting records of Blue Bear.

c.     Some entries in the general ledger had no supporting documentation or explanation.

d.     The 2003 audit begun by Rulon had not yet been completed.

e.     Many major Accounts and loans were nonperforming.

f.     Blue Bear's internal financial statements were being prepared on an accrual basis of accounting.  The lack of customer performance in the factoring and loan portfolios had created significant accruals of fees and interest (and related revenue) that were not collectible.  The continual accrual of fees, interest and related revenue with no adjustment for collectibility created a financial picture that was wildly distorted from reality.

g.     All Blue Bear funds were being co-mingled in one bank account.

h.     The IFC Executive Directors did not know what Accounts and loans they funded and to what extent.

100.     As a result of these concerns, Mr. Davis took several immediate steps, including without limitation (a) instituting a cash method of accounting for revenue recognition beginning March 2005; (b) opening separate bank accounts for operating funds and payroll; and (c) instituting a procedure which required each IFC Executive Director to approve, in advance, specific Accounts for funding in all existing and new Clients.  Mr. Davis also terminated Rulon's audit services.

101.     After opening separate bank accounts, it became evident that Blue Bear was very cash poor. In early May 2005, Mr. Davis hired the accounting firm of Sample & Bailey, P.C. ("S&B"), to review and perform an audit of Blue Bear's books and records for 2003 and 2004.

102.     One area of immediate concern that emerged from S&B's investigations was that Blue Bear's 2004 financials needed to be restated on a cash basis.  Specifically, Blue Bear had been accounting and operating using the accrual basis of accounting for recognition of revenue,

notwithstanding the nature and reality of the business operations: namely, its Assets were either non-performing or greatly impaired and its cash flow was the typically erratic cash flow of a factoring company.

103.    On or about March 2005, the IFCs were notified of the cash shortages, the need for restatement of the financial statements and the impaired or non-performing Assets.

104.    The restatement of the financials was completed mid-July 2005, and revealed that Blue Bear had been paying investors, the IFCs, operating expenses and its members and the principals of its members as if every single Asset was producing income.  Fees had been calculated and paid to the IFCs based on a fictional accrued number rather than actual cash collections.  Interest was paid whether or not actual fees had been collected.  No reserves had been taken for non-performing Assets.  Non-performing Assets had been shown as accruing income rather than shifted to non-accrual.

105.    Blue Bear estimated that the amount of funds incorrectly distributed may have been at least $600,000 and as much as $2,000,000 or more.  The only source of such distributions would had to have been investor money given to the IFCs, transferred to Blue Bear and then used by Blue Bear in part to pay back the IFCs and the investors.

**Fraudulent Misrepresentations and Omissions Related to the Assets and the Business**

106.    During the conduct of Blue Bear's business, the Karst Group made numerous misrepresentations regarding the Assets and the business.

107.    Specifically, as discussed above, the Karst Group misrepresented the value of the Transferred Assets, since the majority of the loans and Accounts constituting the Transferred Assets were either non-performing or impaired.  Thus, the value of the Transferred Assets was a small fraction of the Transferred Debt.

108.    One or more of the Defendants constituting the Karst Group misrepresented the nature and existence of liens or security interests securing the Assets, when in fact many of such Assets were not secured or improperly secured or perfected, as shown by the example in the following paragraph.

109.    Lance Slayton and NCFS, members of Montana Development, LLC ("Montana"),  formed Montana as part of a venture to refurbish an existing building which was operated as a Travelodge Motel located in Denver, Colorado (the "Motel").2  Montana was originally a borrower from NCFS, and NCFS subsequently transferred this loan to Blue Bear as part of the Transferred Assets in exchange for Blue Bear's assumption of approximately $603,000 in debt.  This loan was not performing at the time of the transfer, nor was the loan, as was represented, secured by a second lien deed of trust on the Motel.   Specifics of the lien history follow:

---

[2] Currently, the Motel has been abandoned and is in a deteriorating state.

a.     Bruce Wong, LLC ("Wong") conveyed the Motel to Montana by warranty deed dated May 27, 2003, which deed was subsequently recorded with the Adams County Clerk and Recorder ("Adams County") on May 28, 2003.  The purchase price for the Motel was $2,000,000.  Wong financed $1,904,600 of the purchase price, which was secured by a deed of trust from Montana.  This deed of trust was recorded in Adams County on May 28, 2003.

b.     After May 27, 2003, NCFS (and subsequently Blue Bear) made advances to Montana, which advances eventually totaled approximately $1,500,000.

c.     On or about May 17, 2004, Montana borrowed approximately $ 167,000 from Brad Burget ("Burget").  This loan was secured by a deed of trust in the Motel, which was recorded on May 16, 2004, in Adams County.

d.     On or about July 7, 2004, Montana borrowed $120,000 from Adobe Oil Development Corp.("Adobe").  This loan was secured by a deed of trust in the Motel, which was recorded on July 14, 2004, in Adams County.

e.     On March 21, 2005, Montana granted a deed of trust to Blue Bear in the principal amount of approximately $1,150,000.00.  This deed of trust was recorded on April 11, 2005 in Adams County, as security for the repayment of indebtedness evidenced by Montana's notes dated various dates after May 27, 2003.

f.     Montana made few, if any payments to the secured lenders described above.  Wong foreclosed on the Motel in late 2005, realizing approximately $2.1 million.  This amount was insufficient to pay any of subsequent lien holders, including Blue Bear.

g.     Since NCFS, and subsequently Blue Bear, failed to perfect their security interest in the Motel prior to the other intervening liens, Blue Bear lost all monies invested by it and NCFS in this property.

110.   One or more of the defendants constituting the Karst Group failed to disclose their personal involvement with several of the Assets thereby creating a conflict of interest which directly or indirectly benefited the Karst Group to the detriment of Blue Bear and the IFCs.  A few examples are:

a.     Women's Interactive Network, Inc. ("WIN") and Orizon Health Care Consultants, Inc. ("Orizon").  The principals of both WIN and Orizon are Karst and Dennis Waxberg.  The WIN Account was transferred from NCFS to Blue Bear.  Principal amounts due from these Clients total $ 330,391.00 in the aggregate, which have been written off as bad debt.

b.     Global Debit Cash Card, Inc. ("GDCC").  This Account is entangled and affiliated with other Clients, Karst and Karst affiliates.  GDCC is a subsidiary of Seamless Wi-Fi, Inc. f/k/a Alpha Wireless Broadband, Inc. ("Seamless"), a Nevada public company that is an Internet company allegedly developing internet technologies for both businesses and consumers. Albert Reda is Seamless' president, as well as GDCC's CEO.  While it is not allegedly a Client, Seamless has received advances directly from Blue Bear which were booked or notated to GDCC.  As of June 30, 2005, the shareholders of Seamless included Reda Family Trust, a former Client of Blue Bear which is controlled by Reda, and Windsor Professional Plaza, a Client of

Blue Bear which is owned by Karst.  Further, Skyy-Fi, Inc., a subsidiary of Seamless and allegedly in the business of establishing wireless "hot-spots" for Internet access, is a Client. Principal amounts due from these Clients total $482,424.00 in the aggregate, which have been written off as bad debt.

       c.    Aggregate Productions, Inc.  Karst, a former owner of this Client, leased equipment to other Clients known as Castle Rock Aggregates and Ground Zero Engineering Group, Inc.  Principal amounts due from these Clients total $1,325,598.00 in the aggregate.

111.    Karst prepared and provided financial information to the investors and the IFCs which inflated the value of the Assets and the financial performance of the Assets.  For example, commencing December of 2003, Karst prepared monthly statements for distribution to Blue Bear and the IFCs (the "Monthly Statements"), purportedly showing the percentage interest of each IFC in the Accounts and loans, the income accruing to each such Account or loan and the monies distributed or to be distributed to Blue Bear's members or consultants.

112.    Karst, in his communications with the investors and the IFCs, including communications via the Monthly Reports, omitted material information as to the true source of Blue Bear's cash used to make payments to investors, the IFCs and vendors, thus concealing the use of investor funds to make many such payments and the deleterious financial condition of Blue Bear.

**Improper Cash Transfers to BBFI, Disberger, Short and Karst**

113.    BBFI, Disberger, Short and Karst obtained substantial sums from Blue Bear for which there was no adequate consideration.  The sums such parties transferred, or caused to be transferred, from Blue Bear, bore no resemblance to the amounts due under the BBFI Agreement or the Employment Agreement, as appropriate.  Specifically, $400,000 was transferred to BBFI, and $160,000 was transferred to Karst and/or NCFS for the benefit of Karst.

114.    On or about May 31, 2005, BBFI returned $250,000.00 of this amount to Blue Bear (the "BBFI Repayment").

**Payments by Blue Bear to Certain Defendants**

115.    During the one year preceding the Petition Date, Blue Bear made the following payments to Aspen (the "Aspen Transfers"):

| Date | Check # | Amount |
|------|---------|--------|
| 08/26/04 | 1426 | $ 2,250.00 |
| 09/14/04 | 1488 | $ 923.22 |
| 09/15/04 | 1492 | $ 1,812.34 |
| 12/01/04 | 1585 | $ 1,725.00 |
| 02/01/05 | 1685 | $ 225.00 |
| 02/17/05 | 1711 | $ 64.02 |
| 03/29/05 | 1028 | $ 1,293.31 |
| | | $ 8,292.89 |

18

116.    From October 25, 2003 through July 7, 2004, Blue Bear made the following payments to Aspen (the "Other Aspen Transfers"):

| Date | Check # | Amount |
|------|---------|--------|
| 10/25/03 | none | $    4,500.00 |
| 10/25/03 | none | $    5,000.00 |
| 2/6/04 | 1028 | $       832.23 |
| 3/11/04 | 1077 | $  12,873.00 |
| 3/15/04 | 1083 | $       165.30 |
| 3/24/04 | 1206 | $    6,436.50 |
| 4/01/04 | 1217 | $       800.00 |
| 4/15/04 | 1235 | $    6,436.50 |
| 5/12/04 | 1267 | $    2,033.24 |
| 5/18/04 | 1288 | $    6,436.50 |
| 6/7/04 | 1313 | $    2,200.00 |
| 6/15/04 | 1326 | $    6,436.50 |
| 7/7/04 | 1343 | $         43.69 |
|  |  | $54,193.46 |

117.    During the one year preceding the Petition Date, Blue Bear made the following payments to BBFI (the "BBFI Transfers"):

| Date | Check # | Amount |
|------|---------|--------|
| 08/26/04 | elec transfer | $15,000.00 |
| 09/01/04 | elec transfer | $20,250.00 |
| 09/29/04 | elec transfer | 10,000.00 |
| 10/01/04 | elec transfer | $35,000.00 |
| 10/26/04 | elec transfer | $10,000.00 |
| 10/29/04 | elec transfer | $36,500.00 |
| 11/05/04 | elec transfer | $8,695.00 |
| 11/15/04 | elec transfer | $10,000.00 |
| 11/16/04 | elec transfer | $3,000.00 |
| 12/01/04 | elec transfer | $40,000.00 |
| 12/02/04 | elec transfer | $3,000.00 |
| 12/08/04 | elec transfer | $1,000.00 |
| 12/15/04 | elec transfer | $8,000.00 |
| 12/17/04 | elec transfer | $3,000.00 |
| 12/30/04 | elec transfer | $50,000.00 |
| 02/01/04 | elec transfer | $42,000.00 |
| 02/16/05 | elec transfer | $9,000.00 |
| 02/16/05 | elec transfer | $9,000.00 |
| 08/01/05 | elec transfer | $22,767.76 |
| 11/05/04 | elec transfe | $8,695.00 |
|  |  | $344,907.76 |

19

118.    From January 6, 2004 through November 5, 2004, Blue Bear made the following payments to BBFI (the "Other BBFI Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 01/06/04 | elec transfe | $1,500.00 |
| 01/13/04 | elec transfe | $500.00 |
| 02/05/04 | elec transfe | $4,000.00 |
| 02/27/04 | elec transfe | $7,021.58 |
| 03/08/04 | elec transfe | $4,000.00 |
| 03/19/04 | elec transfe | $13,000.00 |
| 03/30/04 | elec transfe | $3,000.00 |
| 04/07/04 | elec transfe | $10,000.00 |
| 04/14/04 | elec transfe | $15,000.00 |
| 04/30/04 | elec transfer | $5,000.00 |
| 05/26/04 | elec transfe | $40,000.00 |
| 06/08/04 | elec transfe | $10,000.00 |
| 07/14/04 | elec transfe | $5,000.00 |
| 07/28/04 | elec transfe | $5,000.00 |
| 07/30/04 | elec transfe | $50,000.00 |
| 08/10/04 | elec transfe | $10,000.00 |
|  |  | $183,021.58 |

119.    During the one year preceding the Petition Date, Blue Bear made the following payments to Karst (the "Karst Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 08/25/04 | 1425 | $ 50,000.00 |
| 10/27/04 | 1551 | $ 20,000.00 |
| 12/15/04 | 1610 | $ 25,000.00 |
| 01/31/05 | 1682 | $ 15,000.00 |
|  |  | $ 110,000.00 |

120.    From March 16, 2004, through June 24, 2004, Blue Bear made the following payments to Karst (the "Other Karst Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 3/16/04 | 1202 | $ 9,100.00 |
| 3/24/04 | 1208 | $ 4,550.00 |
| 4/15/04 | 1241 | $ 4,550.00 |
| 5/18/04 | 1290 | $ 4,550.00 |
| 6/15/04 | 1322 | $ 4,550.00 |
| 6/16/04 | 1332 | $ 2,391.42 |
| 6/24/04 | 1340 | $ 50,000.00 |
|  |  | $79,691.42 |

20

121.     During the one year preceding the Petition Date, Blue Bear made the following payments to NCFS (the "NCFS Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 9/1/04 | Elect transfer | $   14,332.76 |
| 9/1/04 | 1467 | $     2,789.00 |
| 9/15/04 | Elect transfer | $        369.83 |
| 12/22/04 | Elect transfer | $   20,781.81 |
| 12/20/04 | Elect transfer | $   88,749.32 |
| | | $127,022.72 |

122.     From December 23, 2003, through July 15, 2004, Blue Bear made the following payments to NCFS (the "Other NCFS Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 12/23/03 | Elect transfer | $   46,310.93 |
| 12/24/03 | Elect transfer | $   42,343.05 |
| 2/4/04 | 1022 | $        796.15 |
| 3/2/04 | 1058 | $     6,804.78 |
| 3/2/04 | 1059 | $   45,000.00 |
| 3/11/04 | Elect transfer | $   46,500.00 |
| 3/15/04 | 1093 | $          12.46 |
| 3/19/04 | Elect transfer | $   16,626.21 |
| 3/19/04 | Elect transfer | $   75,975.94 |
| 4/1/04 | 1221 | $          10.56 |
| 4/6/04 | 1230 | $   12,781.80 |
| 4/9/04 | Elect transfer | $   62,198.37 |
| 4/12/04 | Elect transfer | $     2,978.92 |
| 4/13/04 | 1234 | $   40,000.00 |
| 4/14/04 | Elect transfer | $     7,041.98 |
| 4/14/04 | Elect transfer | $   45,000.00 |
| 4/23/04 | Elect transfer | $   50,000.00 |
| 4/27/04 | Elect transfer | $   50,000.00 |
| 4/28/04 | Elect transfer | $   45,000.00 |
| 5/14/04 | Elect transfer | $     7,400.00 |
| 5/17/04 | Elect transfer | $     8,400.00 |
| 5/26/04 | Elect transfer | $   13,259.02 |
| 6/7/04 | Elect transfer | $     2,000.00 |
| 6/7/04 | 1318 | $          35.99 |
| 7/15/04 | Elect transfer | $ 510,124.09 |
| | | $1,136,600.25 |

123.    During the one year preceding the Petition Date, Blue Bear made the following payments to DKD Connections (the "DKD Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 09/01/04 | 1455 | $      5,000.00 |
| 09/01/04 | 1456 | $         167.90 |
| 09/03/04 | 1478 | $    20,000.00 |
| 09/23/04 | 1511 | $      5,000.00 |
| 10/01/04 | 1518 | $    15,043.99 |
| 11/01/04 | 1552 | $    15,411.70 |
| 11/15/04 | 1575 | $         102.88 |
| 12/01/04 | 1590 | $    15,145.54 |
| 12/15/04 | 1615 | $         114.82 |
| 01/01/05 | 1641 | $    15,012.70 |
| 02/01/05 | 1692 | $    15,000.00 |
| 02/17/05 | 1716 | $           26.76 |
| 03/01/05 | 992 | $    15,000.00 |
| 04/01/05 | 1039 | $    15,000.00 |
| 05/03/05 | 1070 | $    15,000.00 |
| 07/01/05 | 1223 | $    10,000.00 |
|  |  | $ 161,026.29 |

//

//

//

//

124.    From January 5, 2004, through August 2, 2004, Blue Bear made the following payments to DKD Connections (the "Other DKD Transfers"):

| Date | Check # | Amount |
|------|---------|--------|
| 1/5/04 | 1000 | $ 5,000.00 |
| 1/9/04 | 1005 | $ 1,078.51 |
| 2/5/04 | 1025 | $ 5,361.82 |
| 2/6/04 | 1039 | $ 1,859.04 |
| 3/5/04 | 1061 | $ 5,000.00 |
| 3/11/04 | 1079 | $ 3,892.58 |
| 3/15/04 | 1088 | $ 47.91 |
| 4/1/04 | 1215 | $ 5,060.00 |
| 4/1/04 | 1216 | $ 3,789.32 |
| 4/15/04 | 1239 | $ 227.02 |
| 4/16/04 | 1255 | $ 3,974.16 |
| 4/30/04 | 1258 | $ 5,184.46 |
| 5/3/04 | 1260 | $ 5,184.46 |
| 5/20/04 | 1294 | $ 3,833.40 |
| 6/1/04 | 1307 | $ 5,056.72 |
| 7/1/04 | 1341 | $ 5,000.00 |
| 7/7/04 | 1349 | $ 14.97 |
| 7/23/04 | 1374 | $ 4,628.62 |
| 8/1/04 | 1379 | $ 5,000.00 |
| 8/2/04 | 1405 | $ 2,199.36 |
| 8/2/04 | 1406 | $ 1,913.72 |
| 8/2/04 | 1407 | $ 1,067.76 |
| 8/2/04 | 1408 | $ 761.72 |
| 8/2/04 | 1400 | $ 19.27 |
| | | $75,154.82 |

//

//

//

//

During the one year preceding the Petition Date, Blue Bear made the following payments to Key Connections (the "Key Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 09/01/04 | 1460 | $ 5,000.00 |
| 09/01/04 | 1461 | $ 63.44 |
| 09/03/04 | 1479 | $ 20,000.00 |
| 09/23/04 | 1512 | $ 5,000.00 |
| 10/01/04 | 1521 | $ 15,000.00 |
| 11/01/04 | 1553 | $ 15,085.48 |
| 12/01/04 | 1594 | $ 15,005.32 |
| 12/30/04 | 1634 | $ 783.00 |
| 01/01/05 | 1645 | $ 15,000.00 |
| 01/14/05 | 1664 | $ 99.00 |
| 02/01/05 | 1691 | $ 15,000.00 |
| 03/01/05 | 993 | $ 15,000.00 |
| 04/01/05 | 1038 | $ 15,000.00 |
| 05/03/05 | 1069 | $ 15,000.00 |
| 07/01/05 | 1222 | $ 10,000.00 |
|  |  | $ 161,036.24 |

125.    From January 5, 2004 through August 2, 2004, Blue Bear made the following payments to Key Connections (the "Other Key Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 1/5/04 | 1001 | $ 5,000.00 |
| 1/9/04 | 1011 | $ 193.05 |
| 2/5/04 | 1024 | $ 5,146.45 |
| 2/6/04 | 1041 | $ 1,239.36 |
| 3/5/04 | 1062 | $ 5,000.00 |
| 3/11/04 | 1080 | $ 2,643.19 |
| 3/15/04 | 1092 | $ 30.55 |
| 4/1/04 | 1213 | $ 5,000.00 |
| 4/1/04 | 1214 | $ 2,544.67 |
| 4/21/04 | 1257 | $ 2,682.69 |
| 5/3/04 | 1259 | $ 5,103.66 |
| 5/20/04 | 1293 | $ 2,695.43 |
| 6/1/04 | 1306 | $ 5,000.00 |
| 7/1/04 | 1342 | $ 5,000.00 |
| 7/23/04 | 1373 | $ 3,254.33 |
| 8/1/04 | 1378 | $ 5,000.00 |
| 8/2/04 | 1401 | $ 1,460.10 |
| 8/2/04 | 1402 | $ 1,337.64 |
| 8/2/04 | 1403 | $ 777.92 |
| 8/2/04 | 1404 | $ 538.56 |
|  |  | $ 48,068.74 |

**Proof of Claims Filed by Certain Defendants**

126.     On or about October 10, 2005, Key Connections filed its unsecured proof of claim No. 101 against Blue Bear in the amount of $45,161.29 (the "Key Claim"), for amounts allegedly due and payable under its Services Agreement.

127.     On or about October 12, 2005, DKD Connections filed its unsecured proof of claim No. 62 against Blue Bear in the amount of $45,161.29 (the "DKD Claim"), for amounts allegedly due and payable under its Services Agreement.

128.     On or about October 12, 2005, the Donahoos filed their unsecured proof of claim No. 61 against Blue Bear in the amount of $11,820.99 (the "Donahoo Claim"), for amounts due and payable as creditors in Blue Bear.

129.     On or about December 5, 2003, Short and Lisa Short, his wife, filed their unsecured proof of claim No. 163 against Blue Bear in the amount of $121,139.20 (the "First Short Claim"), for amounts due and payable as creditors in Blue Bear.

130.     On or about December 5, 2003, Short filed its unsecured proof of claim No. 164 against Blue Bear in the amount of $202,001.00 (the "Second Short Claim"), for amounts due and payable as creditors in Blue Bear.

131.     On or about February 6, 2006, NCFS filed its unsecured proof of claim No. 462 against Blue Bear in the amount of $88,749.62 (the "NCFS Claim"), for a loan allegedly due and payable to NCFS.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Intentional Misrepresentation—the Karst Group)

132.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

133.     Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

134.     Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

135.     Each defendant comprising the Karst Group made material false or misleading statements (including statements which omitted material information) to Blue Bear, the Assigning IFCs and, upon information and belief, the Assigning Investors in the course of the transfer of the assets from NCFS to Blue Bear and Blue Bear's subsequent operations and financial performance (the "Misrepresentations").

136.     The Misrepresentations of which Plaintiffs are currently aware include:

      a.     Statements by the Karst Group of the value of the Transferred Assets at the time of transfer when such assets were non-performing and grossly over-valued.

      b.     Statements by the Karst Group concerning the existence of liens or security interests securing the Transferred Assets, when in fact many of such assets were not secured or secured with a lesser priority.

      c.     The Karst Group's concealment of its business interests or familial connections with many of Blue Bear's Clients.

      d.     Statements by the Karst Group falsely inflating the value of the Assets and the financial performance of Blue Bear.

      e.     The Karst Group's omission of material information as to the source of Blue Bear's revenues used to make payments to investors, the IFCs and vendors, thus concealing the use of investor funds to make many such payments and the deleterious financial condition of Blue Bear.

137.     Each of the defendants constituting the Karst Group made these Misrepresentations to Plaintiffs in connection with Blue Bear's Assets and operations.

138.     Each of the defendants constituting the Karst Group made these Misrepresentations to induce Plaintiffs to act or refrain from acting.

139.     Each of the defendants constituting the Karst Group made these Misrepresentations with knowledge of its untruth, or recklessly and willfully made it without regard to its consequences.

140.     Each of the defendants constituting the Karst Group made these Misrepresentations with the intent to mislead and deceive Plaintiffs.

141.     Each of the defendants constituting the Karst Group made these Misrepresentations with the intent or knowing that Plaintiffs would act in reliance on the Misrepresentations.

142.     Plaintiffs justifiably relied on each of the Misrepresentations.

143.     Plaintiffs' reliance on the Misrepresentations caused them to suffer damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation—the Karst Group, the BBFI Group and the Senior Consultants)

144.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

145.    Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

146.    Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

147.    Each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants made the Misrepresentations to Plaintiffs in the course of the transfer of the assets from NCFS to Blue Bear and Blue Bear's subsequent operations and financial performance, in which each had a financial interest.

148.    Each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants made the Misrepresentations to Plaintiffs for the use of Plaintiffs in connection with of the transfer of the assets from NCFS to Blue Bear and Blue Bear's subsequent operations and financial performance.

149.    Each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants was negligent in making the Misrepresentations to Plaintiffs.

150.    Each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants made the Misrepresentations with the intent or knowing that Plaintiffs would act in reliance on such Misrepresentations.

151.    Plaintiffs relied on the false information.

152.    Plaintiffs' reliance on the false information caused Plaintiffs to suffer damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty—Karst, KFG, BBFI, Short, Disberger and the Senior Consultants)

153.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

154.    Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code.

155.    Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

156.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants owed a fiduciary duty to act for the benefit of the Plaintiffs.

157.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants breached that fiduciary duty to Plaintiffs.

158.    As a result of breach of fiduciary duty by Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants, Plaintiffs suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty—the Karst Group, the BBFI Group and the Senior Consultants)

159.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

160.    Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code.

161.    Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

162.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants had fiduciary relationships with and owed fiduciary duties to Plaintiffs.

163.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants breached their fiduciary duties to Plaintiffs.

164.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants knew, or should have known, that the others breached their respective fiduciary duties to Plaintiffs.

165.    Each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants provided substantial assistance to Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants in breaching their respective fiduciary duties by, among other things, aiding, abetting, participating in and/or assisting in their misrepresentations, omissions, mismanagement and other wrongful conduct.

166.    As a result of the substantial assistance in these breaches of fiduciary duties by each defendant constituting the Karst Group, the BBFI Group and the Senior Consultants, Plaintiffs have suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of Services Agreements and Implied Duty of Good Faith and Fair Dealing—DKD Connections and Key Connections)

167.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

168.    DKD Connections and Key Connections each entered into a Services Agreement with Blue Bear.

169.    The Services Agreements obligated Key Connections and DKD Connections to perform the Consulting Services.

170.     In their respective Services Agreements, Key Connections and DKD Connections warranted that the Consulting Services would be "completed timely and in workmanlike manner and shall conform to reasonable professional bookkeeping, accounting and financial services standards."

171.     DKD Connections and Key Connections each owed a duty to discharge their obligations in good faith and to otherwise act in a manner that was in the best interests of Blue Bear.

172.     DKD Connections and Key Connections each breached the warranties and duties set forth in their respective Agreements, and further breached the implied duty of good faith and fair dealing by virtue of the breaches of fiduciary duty alleged above.

173.     The breach of the Agreements has caused damage to Plaintiffs in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of BBFI Agreement and Implied Duty
of Good Faith and Fair Dealing—BBFI)

174.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

175.     BBFI entered into the BBFI Agreement with Blue Bear.

176.     Pursuant to the BBFI Agreement, BBFI provided consulting services to Blue Bear regarding business strategy and operations.

177.     BBFI owed a duty to discharge its obligations in good faith and to otherwise act in a manner that was in the best interests of Blue Bear.

178.     BBFI breached its duties in the BBFI Agreement, and further breached the implied duty of good faith and fair dealing by virtue of the breaches of fiduciary duty alleged above.

179.     The breach of the BBFI Agreement has caused damage to Plaintiffs in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Consulting Agreements and Implied Duty
of Good Faith and Fair Dealing—Karst)

180.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

181.     Karst entered into an Employment Agreement with Blue Bear.

182.     The Employment Agreement obligated Karst to perform the Employment Services.

183.     Specifically, the Employment Agreement stated that Karst "shall at all times faithfully, industriously, and to the best of his ability, experience, and talent, perform all the duties that may be required of him pursuant to the express and implicit terms [of the Employment Agreement], to the reasonable satisfaction of [Blue Bear]."

184.     Karst owed a duty to Blue Bear to discharge his obligations in good faith and to otherwise act in a manner that was otherwise in the best interests of Blue Bear.

185.     Karst breached the duties and covenants set forth in the Employment Agreement, and further breached the implied duty of good faith and fair dealing by virtue of the breaches of fiduciary duty alleged above.

186.     The breach of the Employment Agreement has caused damage to Plaintiffs in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### (Conversion—BBFI, Disberger, Short and Karst)

187.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

188.     Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

189.     Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

190.     BBFI, Disberger, Short and Karst knowingly and wrongfully obtained control over the funds of Blue Bear without authorization and these defendants did so with the specific intent to permanently deprive Blue Bear of the benefit of such property.

191.     The actions by the BBFI, Disberger, Short and Karst in taking these funds constitute conversion and civil theft of Blue Bear's property.

192.     Such conversion and civil theft caused Plaintiffs to suffer damages in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Civil Conspiracy—Karst, KFG, BBFI, Short, Disberger,
### each defendant constituting the Senior Consultants, Rulon and Scott Rulon)

193.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

194.     Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

195.     Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

196.     Karst, KFG, BBFI, Short, Disberger, each defendant constituting the Senior Consultants, Rulon and Scott Rulon, on information and belief, conspired to solicit funds from investors knowing that such solicitation was improper and that the PPMs used to solicit funds from investors were misleading.

197.     Such conspiracy caused Plaintiffs to suffer damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF
### (Deepening Insolvency—Karst, KFG, BBFI, Short, Disberger, each defendant constituting the Senior Consultants)

198.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

199.     Karst, KFG, BBFI, Short, Disberger and each defendant constituting the Senior Consultants continued to seek, encourage and/or accept new investment dollars from the IFCs and the investors, even though Blue Bear was insolvent.

200.     Karst, KFG, BBFI, Short, Disberger, each defendant constituting the Senior Consultants thereby prolonged Blue Bear's insolvent existence, resulting in the dissipation in Blue Bear's Assets.

201.     As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation—Rulon Group)

202.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

203.     Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

204.     Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to § 544(a) and § 541 of the Bankruptcy Code.

205.     In the course of auditing the financial statements of the IFCs, Rulon and/or Scott Rulon supplied false and misleading statements to the IFCs and their investors.

206.     The audit opinions attached to the IFCs' PPMs omitted material information concerning the financial affairs of the IFCs upon which the investors relied.

207.     In the course of their business, profession or employment, the Rulon Group failed to exercise reasonable care and competence in supplying false audit opinions for the guidance of the IFCs and their investors.

208.     Plaintiffs justifiably and reasonably relied on Rulon and/or Scott Rulon's negligent misrepresentations, which caused them to suffer damages in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### (Breach of Duty of Care—Rulon Group)

209.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

210.     Blue Bear makes those claims pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code, and as assignee of the Assigning IFCs.

211.     Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

212.     Rulon was retained to perform audits of Blue Bear and the IFCs.

213.     Rulon breached its duty to Blue Bear and the IFCs to render its auditing services with competence and diligence, consistent with the ethical requirements and standards of care of the accounting profession, including but not limited to those set forth in GAAS, and to make complete disclosure to Blue Bear and each IFC, as applicable, of all material facts, issues and matters.  As the supervising partner on the audits, Scott Rulon was responsible for Rulon's performance of its duties.

214.     Rulon breached its duty of care to the Initial IFCs by, among other things, (a) failing to disclose material subsequent events which occurred between the date of the audited financial statements and the issuance of same; (b) failing to perform its audits in compliance with GAAS; and (c) producing audit opinions which omitted material facts.

215.     During the course of its audit of Blue Bear's financial statements, Rulon breached its duty of care to Blue Bear by failing to inform and disclose to Blue Bear various material facts, issues and matters, including without limitation, the substantial overvaluation of numerous Assets.

216.     As a result of the Rulon Group's breaches of duty, Plaintiffs suffered damages in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (Deepening Insolvency—Rulon Group)

217.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

218.     In violation of Rulon's duties, including but not limited to its duties and professional obligations as auditors, the Rulon Group materially contributed to the insolvency and deepening insolvency of Blue Bear.  For example, the Rulon Group knew that the failure to disclose the substantial overvaluation of numerous Assets allowed Blue Bear to continue its operations as if it were profitable rather than insolvent, thereby resulting in the incurrence of more debt and the dissipation of the Assets.  In addition, the Rulon Group's assistance and

knowing complicity in the fundraising campaign by Blue Bear and the IFCs facilitated Blue Bear and the IFCs as they incurred further debt.

219.    Through its acts, the Rulon Group proximately caused Blue Bear's deepening insolvency.

220.    the Rulon Group's actions damaged Plaintiffs by allowing the Assets to be further dissipated and reducing their value.

221.    Plaintiffs are entitled to recover damages from Rulon and/or Scott Rulon in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty—Rulon Group)

222.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

223.    Plaintiff Blue Bear makes this claim pursuant to § 544(a) of the Bankruptcy Code or, in the alternative, under § 541 of the Bankruptcy Code.

224.    Plaintiff Committee makes this claim as assignee of the Assigning Investors, as assignee of the Assigning IFCs, and pursuant to §§ 544(a) and 541 of the Bankruptcy Code.

225.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants had fiduciary relationships with and owed fiduciary duties to Plaintiffs.

226.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants breached their fiduciary duties to Plaintiffs.

227.    Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants knew, or should have known, that the others breached their respective fiduciary duties to Plaintiffs.

228.    Rulon and/or Scott Rulon provided substantial assistance to Karst, KFG, BBFI, Short, Disberger, and each defendant constituting the Senior Consultants in breaching their respective fiduciary duties by, among other things, aiding, abetting, participating in and/or assisting in their misrepresentations, omissions, mismanagement and other wrongful conduct.

229.    As a result of the substantial assistance in these breaches of fiduciary duties by Rulon and/or Scott Rulon, Plaintiffs have suffered damages in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF
### (Breach of Contract—Karst and NCFS)

230.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

231.    Pursuant to the terms of the HTI Notes, Karst and NCFS were to make interest payments at 15% per annum to the IFC Noteholders on or before the 30th day of each month

beginning June 30, 2005 and were to pay the IFC Noteholders the principal amount due on each Note on or before November 30, 2005.

232.    Karst and NCFS defaulted on their payment obligations under the HTI Notes and have failed or refused to honor their payment obligations under the HTI Notes.

233.    Pursuant to the terms of the HTI Notes, Karst and/or NCFS agreed to pay all of the IFC Noteholders' reasonable attorneys' fees incurred in enforcing the terms of the HTI Notes.

234.    As of August 1, 2006, a deficiency balance of $2,316,458.99 plus interest remains due and owing on the HTI Notes, plus attorneys fees and costs pursuant to the HTI Notes. Interest continues to accrue on the HTI Notes at 15% per annum

235.    The HTI Notes have been assigned to Blue Bear.

236.    Blue Bear has been damaged by Karst and NCFS' breaches of the HTI Notes.

237.    Plaintiffs request entry of a judgment against Karst and NCFS for unpaid principal, accrued interest owing under the HTI Notes at the rate of 15% per annum, together with post-judgment interest at the rate of 15% per annum, attorneys' fees, and such other and further relief as the Court deems appropriate.

## SIXTEENTH CLAIM FOR RELIEF
### (Quantum Merit—Against all Defendants)

238.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

239.    As a result of the negligent, fraudulent and other wrongful activities, the Defendants have received money or other benefits from the Plaintiffs.

240.    It would be unjust of the Defendants to retain such money or other benefits.

241.    The Plaintiffs are entitled to judgment in an amount to be proven at trial for damages sustained by the Defendants' activities.

## SEVENTEENTH CLAIM FOR RELIEF
### (Avoidance of Aspen Transfers pursuant to 11 U.S.C. § 547(b))

242.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

243.    At all times relevant hereto, Aspen was an insider of Blue Bear within the meaning of § 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

244.    Each of the Aspen Transfers was a transfer of interest in property.

245.    Each of the Aspen Transfers was to or for the benefit of Aspen.

246.    Each of the Aspen Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

247.    Each of the Aspen Transfers was made while Blue Bear was insolvent.

248.    Each of the Aspen Transfers was made during the one year prior to the Petition Date.

249.    The Aspen Transfers enabled Aspen to receive more than Aspen would receive if (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Aspen Transfers had not been made; and (c) Aspen received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

250.    Each of the Aspen Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

251.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Aspen, as the initial transferee and/or beneficiary of the Aspen Transfers, an amount of money equal to the Aspen Transfers and interest from the date of each of the Aspen Transfers.

252.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover an amount of money equal to the Aspen Transfers from Disberger and BBFI to the extent that the foregoing transferees received all or a portion of the Aspen Transfers.

## EIGHTEENTH CLAIM FOR RELIEF
### (Avoidance of Aspen Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and (B))

253.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

254.    This Claim for Relief is an alternative to the preceding Seventeenth Claim for Relief.

255.    Each of the Aspen Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

256.    Each of the Aspen Transfers was made by Blue Bear either voluntarily or involuntarily.

257.    Each of the Aspen Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

258.    In the alternative, each of the Aspen Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

259.     Blue Bear (a) was insolvent on the date that each of the Aspen Transfers was made or became insolvent as a result of each of the Aspen Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Aspen was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

260.     Each of the Aspen Transfers is avoidable under § 548 of the Bankruptcy Code.

261.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Aspen, as the initial transferee and/or beneficiary of the Aspen Transfers, an amount of money equal to the Aspen Transfers and interest from the date of each such transfer.

262.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Disberger and BBFI to the extent that any of the foregoing transferees received all or a portion of the Aspen Transfers.

### NINETEENTH CLAIM FOR RELIEF
### (Avoidance of Aspen Payments pursuant to
### 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105)

263.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

264.     During the period of October 25, 2003 through March 29, 2005, Blue Bear made the Aspen Transfers and the Other Aspen Transfers (collectively, the "Aspen Payments").

265.     Each of the Aspen Payments was a transfer of an interest of Blue Bear in property.

266.     Each of the Aspen Payments was a transfer made by Blue Bear.

267.     Each of the Aspen Payments was made by Blue Bear either voluntarily or involuntarily.

268.     Each of the Aspen Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

269.     In the alternative, each of the Aspen Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

270.     Blue Bear (a) was insolvent on the date that each of the Aspen Payments was made or became insolvent as a result of each of the Aspen Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or

believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

271.    Pursuant to § 544 of the Bankruptcy Code, each of the Aspen Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

272.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Aspen, as the initial obligor and/or beneficiary of the Aspen Payments, an amount of money equal to the Aspen Payments and interest from the date of each such transfer.

273.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Disberger and BBFI to the extent that any of the foregoing transferees received all or a portion of the Aspen Payments.

### TWENTIETH CLAIM FOR RELIEF
### (Avoidance of Aspen Payments pursuant to 11 U.S.C. § 544 and
### Colo. Rev. Stat. § 38-8-106(2))

274.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

275.    At all times relevant hereto, Aspen was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

276.    During the period of October 25, 2003 through March 29, 2005, Blue Bear made the Aspen Payments.

277.    Each of the Aspen Payments was a transfer of an interest of Blue Bear in property.

278.    Each of the Aspen Payments was a transfer made by Blue Bear.

279.    Each of the Aspen Payments was made by Blue Bear either voluntarily or involuntarily.

280.    Each of the Aspen Payments was made on account of antecedent debt owed by Blue Bear to Aspen before such transfer was made.

281.    Each of the Aspen Transfers was made while Blue Bear was insolvent.

282.    Aspen had reasonable cause to believe Blue Bear was insolvent.

283.    Pursuant to § 544 of the Bankruptcy Code, each of the Aspen Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

284.     Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Aspen, as the initial obligor and/or beneficiary of the Aspen Payments, an amount of money equal to the Aspen Payments and interest from the date of each such transfer.

285.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Disberger and BBFI to the extent that any of the foregoing transferees received all or a portion of the Aspen Payments.

### TWENTY-FIRST CLAIM FOR RELIEF
### (Avoidance of BBFI Transfers Pursuant to 11 U.S.C. § 547(b))

286.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

287.     At all times relevant hereto, BBFI was an insider of Blue Bear within the meaning of § 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

288.     The BBFI Transfers were each a transfer of an interest of Blue Bear in property.

289.     Each of the BBFI Transfers was to or for the benefit of BBFI.

290.     Each of the BBFI Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

291.     Each of the BBFI Transfers was made while Blue Bear was insolvent.

292.     Each of the BBFI Transfers was made during the one year prior to the Petition Date.

293.     The BBFI Transfers enabled BBFI to receive more than BBFI would receive if (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the BBFI Transfers had not been made; and (c) BBFI received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

294.     Each of the BBFI Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

295.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from BBFI, as the initial transferee and/or beneficiary of the BBFI Transfers, an amount of money equal to the BBFI Transfers and interest from the date of each of the BBFI Transfers, less the BBFI Repayment.

296.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial

transferee and any mediate transferees thereof.  Blue Bear is or may be entitled to recover an amount of money equal to the BBFI Transfers (less the BBFI Repayment) from Disberger, Aspen and Short to the extent that the foregoing transferees received all or a portion of the BBFI Transfers.

## TWENTY-SECOND CLAIM FOR RELIEF
### (Avoidance of BBFI Transfers pursuant to 11 U.S.C. § 548(a)(1(A) and (B))

297.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

298.    This Claim for Relief is an alternative to the preceding Twenty-First Claim for Relief.

299.    Each of the BBFI Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

300.    Each of the BBFI Transfers was made by Blue Bear either voluntarily or involuntarily.

301.    Each of the BBFI Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

302.    In the alternative, each of the BBFI Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

303.    Blue Bear (a) was insolvent on the date that each of the BBFI Transfers was made or became insolvent as a result of each of the BBFI Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BBFI was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

304.    Each of the BBFI Transfers is avoidable under § 548 of the Bankruptcy Code.

305.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from BBFI, as the initial transferee and/or beneficiary of the BBFI Transfers (less the BBFI Repayment), an amount of money equal to the BBFI Transfers and interest from the date of each such transfer.

306.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Disberger, Short and Aspen to the extent that any of the foregoing transferees received all or a portion of the BBFI Transfers, less the BBFI Repayment.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Avoidance of BBFI Payments pursuant to 11 U.S.C. § 544
### and Colo. Rev. Stat. § 38-8-105)

307.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

308.    During the period of August 26, 2004 through August 1, 2005, Blue Bear made the BBFI Transfers and the Other BBFI Transfers (collectively, the "BBFI Payments").

309.    Each of the BBFI Payments was a transfer of an interest of Blue Bear in property.

310.    Each of the BBFI Payments was a transfer made by Blue Bear.

311.    Each of the BBFI Payments was made by Blue Bear either voluntarily or involuntarily.

312.    Each of the BBFI Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

313.    In the alternative, each of the BBFI Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

314.    Blue Bear (a) was insolvent on the date that each of the BBFI Payments was made or became insolvent as a result of each of the BBFI Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

315.    Pursuant to § 544 of the Bankruptcy Code, each of the BBFI Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

316.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from BBFI, as the initial obligor and/or beneficiary of the BBFI Payments, an amount of money equal to the BBFI Payments (less the BBFI Repayment) and interest from the date of each such transfer.

317.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Aspen, Disberger and Short to the extent that any of the foregoing transferees received all or a portion of the BBFI Payments, less the BBFI Repayment.

### TWENTY-FOURTH CLAIM FOR RELIEF
### (Avoidance of BBFI Payments pursuant to 11 U.S.C. § 544 and
### Colo. Rev. Stat. § 38-8-106(2))

318.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

319.    At all times relevant hereto, BBFI was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

320.    During the period of January 6, 2004 through August 1, 2005, Blue Bear made the BBFI Payments.

321.    Each of the BBFI Payments was a transfer of an interest of Blue Bear in property.

322.    Each of the BBFI Payments was a transfer made by Blue Bear.

323.    Each of the BBFI Payments was made by Blue Bear either voluntarily or involuntarily.

324.    Each of the BBFI Payments was made on account of antecedent debt owed by Blue Bear to BBFI before such transfer was made.

325.    Each of the BBFI Transfers was made while Blue Bear was insolvent.

326.    BBFI had reasonable cause to believe Blue Bear was insolvent.

327.    Pursuant to § 544 of the Bankruptcy Code, each of the BBFI Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

328.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from BBFI, as the initial obligor and/or beneficiary of the BBFI Payments, an amount of money equal to the BBFI Payments (less the BBFI Repayment) and interest from the date of each such transfer.

329.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Disberger and Short to the extent that any of the foregoing transferees received all or a portion of the BBFI Payments, less the BBFI Repayment.

### TWENTY-FIFITH CLAIM FOR RELIEF
### (Avoidance of Karst Transfers pursuant to 11 U.S.C. § 547(b))

330.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

331.    At all times relevant hereto, Karst was an insider of Blue Bear within the meaning of § 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

332.    The Karst Transfers were each a transfer of an interest of Blue Bear in property.

333.    Each of the Karst Transfers was to or for the benefit of Karst.

334.    Each of the Karst Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

335.    Each of the Karst Transfers was made while Blue Bear was insolvent.

336.    Each of the Karst Transfers was made during the one year prior to the Petition Date.

337.    Each of the Karst Transfers enabled Karst to receive more than Karst would receive if (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Karst Transfers had not been made; and (c) Karst received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

338.    Each of the Karst Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

339.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Karst, as the initial transferee and/or beneficiary of the Karst Transfers, an amount of money equal to the Karst Transfers and interest from the date of each of the Karst Transfers.

340.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from KFG and NCFS to the extent that any of the foregoing transferees received all or a portion of the Karst Transfers.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**(Avoidance of Karst Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and (B))**

341.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

342.    This Claim for Relief is an alternative to the preceding Twenty-Fifth Claim for Relief.

343.    Each of the Karst Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

344.    Each of the Karst Transfers was made by Blue Bear either voluntarily or involuntarily.

42

345.     Each of the Karst Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

346.     In the alternative, each of the Karst Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

347.     Blue Bear (a) was insolvent on the date that each of the Karst Transfers was made or became insolvent as a result of each of the Karst Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Karst was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

348.     Each of the Karst Transfers is avoidable under § 548 of the Bankruptcy Code.

349.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Karst, as the initial transferee and/or beneficiary of the Karst Transfers, an amount of money equal to the Karst Transfers and interest from the date of each such transfer.

350.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from KFG and NCFS to the extent that any of the foregoing transferees received all or a portion of the Karst Transfers.

### TWENTY-SEVENTH CLAIM FOR RELIEF
### (Avoidance of Karst Payments pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105)

351.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

352.     During the period of March 16, 2004 through January 31, 2005, Blue Bear made the Karst Transfers and the Other Karst Transfers (collectively, the "Karst Payments").

353.     Each of the Karst Payments was a transfer of an interest of Blue Bear in property.

354.     Each of the Karst Payments was a transfer made by Blue Bear.

355.     Each of the Karst Payments was made by Blue Bear either voluntarily or involuntarily.

356.     Each of the Karst Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

357.     In the alternative, each of the Karst Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

358.     Blue Bear (a) was insolvent on the date that each of the Karst Payments was made or became insolvent as a result of each of the Karst Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

359.     Pursuant to § 544 of the Bankruptcy Code, each of the Karst Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

360.     Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Karst, as the initial obligor and/or beneficiary of the Karst Payments, an amount of money equal to the Karst Payments and interest from the date of each such transfer.

361.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from NCFS and KFG to the extent that any of the foregoing transferees received all or a portion of the Karst Payments.

### TWENTY-EIGHTH CLAIM FOR RELIEF
### (Avoidance of Karst Payments pursuant to 11 U.S.C. § 544 and
### Colo. Rev. Stat. § 38-8-106(2))

362.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

At all times relevant hereto, Karst was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

363.     During the period of March 16, 2004 through January 31, 2005, Blue Bear made the Karst Payments.

364.     Each of the Karst Payments was a transfer of an interest of Blue Bear in property.

365.     Each of the Karst Payments was a transfer made by Blue Bear.

366.     Each of the Karst Payments was made by Blue Bear either voluntarily or involuntarily.

367.     Each of the Karst Payments was made on account of antecedent debt owed by Blue Bear to Karst before such transfer was made.

368.     Each of the Karst Transfers was made while Blue Bear was insolvent.

369.     Karst had reasonable cause to believe Blue Bear was insolvent.

370. Pursuant to § 544 of the Bankruptcy Code, each of the Karst Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

371. Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Karst, as the initial obligor and/or beneficiary of the Karst Payments, an amount of money equal to the Karst Payments and interest from the date of each such transfer.

372. Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof. Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from NCFS and KFG to the extent that any of the foregoing transferees received all or a portion of the Karst Payments.

## TWENTY-NINTH CLAIM FOR RELIEF
(Avoidance of NCFS Transfers pursuant to 11 U.S.C. § 547(b))

373. Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

374. At all times relevant hereto, NCFS was an insider of Blue Bear within the meaning of § 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

375. The NCFS Transfers were each a transfer of an interest of Blue Bear in property.

376. Each of the NCFS Transfers was made to or for the benefit of NCFS.

377. Each of the NCFS Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

378. Each of the NCFS Transfers was made while Blue Bear was insolvent.

379. Each of the NCFS Transfers was made during the one year prior to the Petition Date.

380. Each of the NCFS Transfers enabled NCFS to receive more than NCFS would receive if (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the NCFS Transfers had not been made; and (c) NCFS received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

381. Each of the NCFS Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

382. Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from NCFS, as the initial transferee and/or beneficiary of the NCFS Transfers, an amount of money equal to the NCFS Transfers and interest from the date of each of the NCFS Transfers.

383.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from KFG and Karst to the extent that any of the foregoing transferees received all or a portion of the NCFS Transfers.

## THIRTIETH CLAIM FOR RELIEF
### (Avoidance of NCFS Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and (B))

384.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

385.    This Claim for Relief is an alternative to the preceding Twenty-Ninth Claim for Relief.

386.    Each of the NCFS Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

387.    Each of the NCFS Transfers was made by Blue Bear either voluntarily or involuntarily.

388.    Each of the NCFS Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

389.    In the alternative, each of the NCFS Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

390.    Blue Bear (a) was insolvent on the date that each of the NCFS Transfers was made or became insolvent as a result of each of the NCFS Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with NCFS was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

391.    Each of the NCFS Transfers is avoidable under § 548 of the Bankruptcy Code.

392.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from NCFS, as the initial transferee and/or beneficiary of the NCFS Transfers, an amount of money equal to the NCFS Transfers and interest from the date of each such transfer.

393.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from KFG and Karst to the extent that any of the foregoing transferees received all or a portion of the NCFS Transfers.

## THIRTY-FIRST CLAIM FOR RELIEF
### (Avoidance of NCFS Payments pursuant to
### 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105)

394.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

395.    During the period of December 23, 2003, through December 20, 2004, Blue Bear made the NCFS Transfers and the Other NCFS Transfers (collectively, the "NCFS Payments").

396.    Each of the NCFS Payments was a transfer of an interest of Blue Bear in property.

397.    Each of the NCFS Payments was a transfer made by Blue Bear.

398.    Each of the NCFS Payments was made by Blue Bear either voluntarily or involuntarily.

399.    Each of the NCFS Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

400.    In the alternative, each of the NCFS Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

401.    Blue Bear (a) was insolvent on the date that each of the NCFS Payments was made or became insolvent as a result of each of the NCFS Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

402.    Pursuant to § 544 of the Bankruptcy Code, each of the NCFS Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

403.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from NCFS, as the initial obligor and/or beneficiary of the NCFS Payments, an amount of money equal to the NCFS Payments and interest from the date of each such transfer.

404.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from NCFS and Karst to the extent that any of the foregoing transferees received all or a portion of the NCFS Payments.

### THIRTY-SECOND CLAIM FOR RELIEF
#### (Avoidance of NCFS Payments pursuant to 11 U.S.C. § 544 and
#### Colo. Rev. Stat. § 38-8-106(2))

405.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

406.    At all times relevant hereto, NCFS was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

407.    During the period of December 23, 2003, through December 20, 2004, Blue Bear made the NCFS Payments.

408.    Each of the NCFS Payments was a transfer of an interest of Blue Bear in property.

409.    Each of the NCFS Payments was a transfer made by Blue Bear.

410.    Each of the NCFS Payments was made by Blue Bear either voluntarily or involuntarily.

411.    Each of the NCFS Payments was made on account of antecedent debt owed by Blue Bear to NCFS before such transfer was made.

412.    Each of the NCFS Transfers was made while Blue Bear was insolvent.

413.    NCFS had reasonable cause to believe Blue Bear was insolvent.

414.    Pursuant to § 544 of the Bankruptcy Code, each of the NCFS Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

415.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from NCFS, as the initial obligor and/or beneficiary of the NCFS Payments, an amount of money equal to the NCFS Payments and interest from the date of each such transfer.

416.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from Karst and KFG to the extent that any of the foregoing transferees received all or a portion of the NCFS Payments.

### THIRTY-THIRD CLAIM FOR RELIEF
#### (Avoidance of DKD Transfers pursuant to 11 U.S.C. § 547(b))

417.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

418. At all times relevant hereto, DKD Connections was an insider of Blue Bear within the meaning of §§ 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

419. The DKD Transfers were each a transfer of an interest of Blue Bear in property.

420. Each of the DKD Transfers was made to or for the benefit of DKD Connections.

421. Each of the DKD Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

422. Each of the DKD Transfers was made while Blue Bear was insolvent.

423. Each of the DKD Transfers was made during the one year prior to the Petition Date.

424. The DKD Transfers enabled DKD Connections to receive more than DKD Connections would receive if (a) Blue Bear's bankruptcy case was a case under Chapter 7 of the Bankruptcy Code; (b) the DKD Transfers had not been made; and (c) DKD Connections received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

425. Each of the DKD Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

426. Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from DKD Connections, as the initial transferee and/or beneficiary of the DKD Transfers, an amount of money equal to the DKD Transfers and interest from the date of each of the DKD Transfers.

427. Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof. Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover an amount of money equal to the DKD Transfers from D&K and the Donahoos to the extent that the foregoing transferees received all or a portion of the DKD Transfers.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**(Avoidance of DKD Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and (B))**

428. Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

429. This Claim for Relief is an alternative to the preceding Thirty-Third Claim for Relief.

430. Each of the DKD Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

431.    Each of the DKD Transfers was made by Blue Bear either voluntarily or involuntarily.

432.    Each of the DKD Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

433.    In the alternative, each of the DKD Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

434.    Blue Bear (a) was insolvent on the date that each of the DKD Transfers was made or became insolvent as a result of each of the DKD Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with DKD was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

435.    Each of the DKD Transfers is avoidable under § 548 of the Bankruptcy Code.

436.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from DKD, as the initial transferee and/or beneficiary of the DKD Transfers, an amount of money equal to the DKD Transfers and interest from the date of each such transfer.

437.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from D&K and the Donahoos to the extent that any of the foregoing transferees received all or a portion of the DKD Transfers.

### THIRTY-FIFTH CLAIM FOR RELIEF
### (Avoidance of DKD Payments pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105)

438.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

439.    During the period of January 5, 2004 through July 1, 2005, Blue Bear made the DKD Transfers and the Other DKD Transfers (collectively, the "DKD Payments").

440.    Each of the DKD Payments was a transfer of an interest of Blue Bear in property.

441.    Each of the DKD Payments was a transfer made by Blue Bear.

442.    Each of the DKD Payments was made by Blue Bear either voluntarily or involuntarily.

443.    Each of the DKD Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

444.    In the alternative, each of the DKD Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

445.    Blue Bear (a) was insolvent on the date that each of the DKD Payments was made or became insolvent as a result of each of the DKD Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

446.    Pursuant to § 544 of the Bankruptcy Code, each of the DKD Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

447.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from DKD Connections, as the initial obligor and/or beneficiary of the DKD Payments, an amount of money equal to the DKD Payments and interest from the date of each such transfer.

448.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from D&K and the Donahoos to the extent that any of the foregoing transferees received all or a portion of the DKD Payments.

## THIRTY-SIXTH CLAIM FOR RELIEF
### (Avoidance of DKD Payments pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-106(2))

449.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

450.    At all times relevant hereto, DKD Connections was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

451.    During the period of January 5, 2004 through July 1, 2005, Blue Bear made the DKD Payments.

452.    Each of the DKD Payments was a transfer of an interest of Blue Bear in property.

453.    Each of the DKD Payments was a transfer made by Blue Bear.

454.    Each of the DKD Payments was made by Blue Bear either voluntarily or involuntarily.

455.    Each of the DKD Payments was made on account of antecedent debt owed by Blue Bear to DKD before such transfer was made.

456.    Each of the DKD Payments was made while Blue Bear was insolvent.

457.    DKD Connections had reasonable cause to believe Blue Bear was insolvent.

458.    Pursuant to § 544 of the Bankruptcy Code, each of the DKD Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

459.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from DKD Connections, as the initial obligor and/or beneficiary of the DKD Payments, an amount of money equal to the DKD Payments and interest from the date of each such transfer.

460.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from D&K and the Donahoos to the extent that any of the foregoing transferees received all or a portion of the DKD Payments.

## THIRTY-SEVENTH CLAIM FOR RELIEF
### (Avoidance of Key Transfers pursuant to 11 U.S.C. § 547(b))

461.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

462.    At all times relevant hereto, Key Connections was an insider of Blue Bear within the meaning of §§ 101(31) of the Bankruptcy Code and a creditor of Blue Bear within the meaning of § 101(10) of the Bankruptcy Code.

463.    The Key Transfers were each a transfer of an interest of Blue Bear in property

464.    Each of the Key Transfers was made to or for the benefit of Key Connections.

465.    Each of the Key Transfers was made on account of antecedent debt owed by Blue Bear before such transfer was made.

466.    Each of the Key Transfers was made while the Blue Bear was insolvent.

467.    Each of the Key Transfers was made during the one year prior to the Petition Date.

468.    The Key Transfers enabled Key Connections to receive more than Key Connections would receive if (a) Blue Bear's bankruptcy case was a case under Chapter 7 of the Bankruptcy Code; (b) the Key Transfers had not been made; and (c) Key Connections received payment on the debt to the extent provided by the provisions of the Bankruptcy Code.

469.    Each of the Key Transfers is avoidable as a preferential transfer under § 547 of the Bankruptcy Code.

470.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Key Connections, as the initial transferee and/or beneficiary of the Key Transfers, an amount of money equal to the Key Transfers and interest from the date of each of the Key Transfers.

471.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover an amount of money equal to the Key Transfers from the Makeys to the extent that the foregoing transferees received all or a portion of the Key Transfers.

## THIRTY-EIGHTH CLAIM FOR RELIEF
### (Avoidance of Key Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and (B))

472.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

473.     This Claim for Relief is an alternative to the preceding Thirty Claims for Relief.

474.     Each of the Key Transfers was a transfer of an interest of Blue Bear in property, or was an obligation incurred by Blue Bear.

475.     Each of the Key Transfers was made by Blue Bear either voluntarily or involuntarily.

476.     Each of the Key Transfers was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

477.     In the alternative, each of the Key Transfers was made for less than a reasonably equivalent value in exchange for such transfer or obligation.

478.     Blue Bear (a) was insolvent on the date that each of the Key Transfers was made or became insolvent as a result of each of the Key Transfers; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Key Connections was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

479.     Each of the Key Transfers is avoidable under § 548 of the Bankruptcy Code.

480.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is entitled to recover from Key Connections, as the initial transferee and/or beneficiary of the Key Transfers, an amount of money equal to the Key Transfers and interest from the date of each such transfer.

481.     Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are

likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from the Makeys to the extent that any of the foregoing transferees received all or a portion of the Key Transfers.

## THIRTY-NINTH CLAIM FOR RELIEF
### (Avoidance of Key Payments pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105)

482.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

483.    During the period of January 5, 2004 through July 1, 2005, Blue Bear made the Key Transfers and the Other Key Transfers (collectively, the "Key Payments").

484.    Each of the Key Payments was a transfer of an interest of Blue Bear in property.

485.    Each of the Key Payments was a transfer made by Blue Bear.

486.    Each of the Key Payments was made by Blue Bear either voluntarily or involuntarily.

487.    Each of the Key Payments was made with the actual intent to hinder, delay or defraud entities to which Blue Bear was or became, on or after the date that such transfer was made.

488.    In the alternative, each of the Key Payments was incurred for less than a reasonably equivalent value in exchange for such transfer.

489.    Blue Bear (a) was insolvent on the date that each of the Key Payments was made or became insolvent as a result of each of the Key Payments; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Blue Bear was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond Blue Bear's ability to pay as such debts matured.

490.    Pursuant to § 544 of the Bankruptcy Code, each of the Key Payments is avoidable under Colo. Rev. Stat. § 38-8-105.

491.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Key, as the initial obligor and/or beneficiary of the Key Payments, an amount of money equal to the Key Payments and interest from the date of each such transfer.

492.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from the Makeys to the extent that any of the foregoing transferees received all or a portion of the Key Payments.

## FORTIETH CLAIM FOR RELIEF
### (Avoidance of Key Payments pursuant to 11 U.S.C. § 544 and
### Colo. Rev. Stat. § 38-8-106(2))

493.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

494.    At all times relevant hereto, Key Connections was an insider of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(8) and a creditor of Blue Bear within the meaning of Colo. Rev. Stat. § 38-8-102(5).

495.    During the period of January 5, 2004 through July 1, 2005, Blue Bear made the Key Payments.

496.    Each of the Key Payments was a transfer of an interest of Blue Bear in property.

497.    Each of the Key Payments was a transfer made by Blue Bear.

498.    Each of the Key Payments was made by Blue Bear either voluntarily or involuntarily.

499.    Each of the Key Payments was made on account of antecedent debt owed by Blue Bear to Key Connections before such transfer was made.

500.    Each of the Key Payments was made while Blue Bear was insolvent.

501.    Key Connections had reasonable cause to believe Blue Bear was insolvent.

502.    Pursuant to § 544 of the Bankruptcy Code, each of the Key Payments is avoidable under Colo. Rev. Stat. § 38-8-106(2).

503.    Pursuant to § 550 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-108 and 109, Blue Bear is entitled to recover from Key Connections, as the initial obligor and/or beneficiary of the Key Payments, an amount of money equal to the Key Payments and interest from the date of each such transfer.

504.    Pursuant to § 550 of the Bankruptcy Code, Blue Bear is also entitled to recover the amount of money transferred and avoided from the immediate transferee of the initial transferee and any mediate transferees thereof.  Upon the belief that the following allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, Blue Bear is or may be entitled to recover from the Makeys to the extent that any of the foregoing transferees received all or a portion of the Key Payments.

## FORTY-FIRST CLAIM FOR RELIEF
### (Disallowance of Key Claim pursuant to 11 U.S.C. § 502(d))

505.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

506.    The Key Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

507.    Key Connections has not paid to Blue Bear the amount of the Key Payments.

508.    The Key Claim should be disallowed because the Key Claim is based on its Service Agreement and Key Connections breached such Agreement.

509.    The Key Claim should be disallowed in its entirety.

### FORTY-SECOND CLAIM FOR RELIEF
### (Disallowance of DKD Claim pursuant to 11 U.S.C. § 502(d))

510.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

511.    The DKD Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

512.    DKD Connections has not paid to Blue Bear the amount of the DKD Payments.

513.    The DKD Claim should be disallowed because the DKD Claim is based on its Service Agreement and DKD Connections breached such Agreement.

514.    The DKD Claim should be disallowed in its entirety.

### FORTY-THIRD CLAIM FOR RELIEF
### (Disallowance of Donahoo Claim pursuant to 11 U.S.C. § 502(d))

515.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

516.    The DKD Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

517.    DKD Connections has not paid to Blue Bear the amount of the DKD Payments.

518.    The Donahoo Claim should be disallowed since, as the likely immediate transferees of DKD Connections, have not paid to Blue Bear the amount of the DKD Payments received by them from DKD Connections.

519.    The claims of Blue Bear against the DKD and the Donahoos are greater than the Donahoo Claim.

### FORTY-FOURTH CLAIM FOR RELIEF
### (Disallowance of First Short Claim pursuant to 11 U.S.C. § 502(d))

520.    Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

521.    The BBFI Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

522.     BBFI has not paid to Blue Bear the amount of the BBFI Payments, except as they may have paid all or a portion of the BBFI Repayment.

523.     Short and Lisa Short, as the likely immediate transferees of BBFI, have not paid to Blue Bear the amount of the BBFI Payments received by them from BBFI, except as they may have paid all or a portion of the BBFI Repayment.

524.     The claims of Blue Bear against BBFI and Short are greater than the First Short Claim.

## FORTY-FIFTH CLAIM FOR RELIEF
### (Disallowance of Second Short Claim pursuant to 11 U.S.C. § 502(d))

525.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

526.     The BBFI Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

527.     BBFI has not paid to Blue Bear the amount of the BBFI Payments, except as they may have paid all or a portion of the BBFI Repayment.

528.     Short as the likely immediate transferee of BBFI, has not paid to Blue Bear the amount of the BBFI Payments received by him from BBFI except as they may have paid all or a portion of the BBFI Repayment.

529.     The claims of Blue Bear against BBFI and Short are greater than the Short Claim.

## FORTY-SIXTH CLAIM FOR RELIEF
### (Disallowance of NCFS Claim pursuant to 11 U.S.C. § 502(d))

530.     Blue Bear incorporates the foregoing paragraphs as if fully set forth herein.

531.     The NCFS Payments are avoidable pursuant to 11 U.S.C. §§ 544, 547 or 548, and recoverable pursuant to 11 U.S.C. § 550.

532.     NCFS has not paid to Blue Bear the amount of the NCFS Payments

533.     The claims of Blue Bear against NCFS are greater than the NCFS Claim.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in their favor, and against the Defendants as follows:

A.     Awarding Plaintiffs compensatory damages on all claims;

B.     Awarding Plaintiffs pre- and post-judgment interest as may be allowed under statutory law;

C.	Awarding Plaintiffs their attorneys' fees and costs;

D.	Awarding Plaintiffs treble damages, attorneys fees and costs under Colo. Rev. Stat. § 18-4-405.

E.	Avoiding the Aspen Transfers, the BBFI Transfers, the Karst Transfers, the DKD Transfers and the Key Transfers as preferential transfers under § 547 of the Bankruptcy Code;

F.	In the alternative, finding that the Aspen Transfers, the BBFI Transfers, the Karst Transfers, the DKD Transfers and the Key Transfers avoidable as fraudulent transfers under § 548 of the Bankruptcy Code;

G.	Avoiding the Aspen Payments, the BBFI Payments, the Karst Payments, the NCFS Payments, the DKD Payments and the Key Payments under.§ 544 of the Bankruptcy Code and Colo. Rev. Stat. §§ 38-8-105 and 106(2).

H.	Awarding Blue Bear damages in the amount of each of the Aspen Payments, the BBFI Payments, the Karst Payments, the NCFS Payments, the DKD Payments and the Key Payments;

I.	Disallowing the DKD Claim, the Key Claim, the Donahoo Claim, the First Short Claim, the Second Short Claim and the NCFS Claim; and

J.	And for such other and further relief as the Court deems proper.

DATED this 31st day of August, 2006.


JESSOP & COMPANY, P.C.					HOLLAND & HART, LLP


By:	_____/s/  Alice A.White_____			By:	/s/ Risa Lynn Wolf-Smith_____
	Douglas W. Jessop, #13299					Peter C. Houtsma, #7639
	Alice A. White, #14537					Risa Lynn Wolf-Smith, #15835
303 East 17th Avenue, Suite 930				Michael R. MacPhail, #26382
Denver, Colorado 80203					555 Seventeenth Street, Suite 3200
Telephone: (303) 860-7700					Denver, Colorado 80202
Facsimile: (303) 860-7233					Telephone: (303) 295-8000
Email: dwjessop@jessopco.com				Facsimile: (303) 295-8261
Email: aawhite@jessopco.com				Email: phoutsma@hollandhart.com
							Email: rwolf@hollandhart.com
Attorneys for Blue Bear Funding, LLC			Email: mrmacphail@hollandhart.com

							Attorneys for the Official Unsecured
							Creditors' Committee