## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: BLUE BEAR FUNDING LLC, f/k/a 1st American Factoring, LLC, n/k/a Pelican Financial Services, Inc., a Colorado limited liability company; <br><br> EIN: 20-0063205 <br><br> Debtor. | ) ) ) ) ) ) | Case No. 05-31300 ABC <br><br> Chapter 11 |
| BLUE BEAR FUNDING, LLC, f/k/a 1ST AMERICAN FACTORING, LLC, a Colorado limited liability company; and <br><br> THE OFFICIAL UNSECURED CREDITORS' COMMITTEE; <br><br>      Plaintiffs, <br><br> vs. <br><br> DAVID KARST, et al., <br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Adversary Proceeding No. 06-1765 ABC |

---

## FINAL PRETRIAL ORDER

---

### 1.    Date of Conference

A Final Pretrial Conference was held on Tuesday, March 4, 2008, at 9:00 a.m. Appearing for Plaintiffs was Peter C. Houtsma of Holland & Hart, LLP. Appearing *pro se* were Gerald and Peggy Makey ("Makeys").

### 2.    Jurisdiction

The parties stipulate to the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1334(b) and 157, and 11 U.S.C. §§ 105(a), 502(d), 541, 544, 547, 548, 550 and 551. This proceeding was commenced pursuant to Fed. R. Bankr. P. 7001 et seq. This

proceeding is a core proceeding under the provisions of 28 U.S.C. §§ 157(b) (2) (A), (F), (H), and (O).  Venue is proper in this Court pursuant to the provisions of 28 U.S.C. §§ 1408 and 1409.

### 3.    Claims and Defenses of the Parties

#### A.    Plaintiffs' Claims

The Makeys have been associated with David Karst and his factoring businesses since 2000.  The Makeys' involvement with Mr. Karst's company, Nationwide Cash Flow Specialists ("NCFS"), began in 2000.  They made a personal investment in NCFS in the latter part of 2000 and in 2002 formed an investment club, Capital Growth Management, LLC, to facilitate investments in NCFS by others.  The Makeys acted as servicing agents for Capital Growth Management, LLC.  The Makeys indicated in a biographical sketch that they were responsible for $10,000,000.00 in investment capital in NCFS.

NCFS was a factoring and loan company which provided funds obtained from many small investors (many from their retirement accounts) to businesses and borrowers who were sub-prime—those who could not otherwise qualify for loans from traditional sources.  Investors were promised above-market returns and these were paid primarily by new investors putting more and more monies into NCFS—a classic "Ponzi" scheme.

In the Spring of 2003, the Makeys became concerned about potential securities law violations arising from the operation of NCFS.  In particular, they were concerned that they were in violation of securities laws that require securities offerings be

-2-

registered and that they had not qualified for any exemptions or safe harbor provisions under those securities laws, including Regulation D. Accordingly, the Makeys and others began the formation of Blue Bear Funding, LLC ("Blue Bear") then known as First American Funding, LLC. The Makeys invited or consented to Mr. Karst becoming involved in this new entity.

The Makeys were involved in the preparation, review and approval of documents and information supplied to investors in this new business, including the review and preparation of Private Placement Memoranda ("PPM") and various Power Point presentations. Various material representations contained in these documents were false as detailed below. The Makeys had knowledge of the representations of fact by receipt of the PPM's and Power Point presentations. The information was supplied in connection with a business transaction. The Makeys failed to exercise reasonable care or competence in obtaining or communicating the information upon which the individual investors relied. The Makeys took no action to ensure that the representations were true or would be accomplished.

Blue Bear was comprised of four member managers: (a) Blue Bear Financial, Inc., with a forty-five percent (45%) membership interest, whose principals were Steve Short and Russell Disberger; (b) KFG, LLC, with a forty-five percent (45%) membership interest, whose principal was David Karst; (c) DKD Connections, LLC, with a five percent (5%) membership interest, whose principals were D&K, LLC, and Kristine and Donald Donahoo; and (d) Key Connections, LLC, with a five percent (5%) membership interest, whose principals were Gerald and Peggy Makey. Key

-3-

Connections was a Colorado limited liability company.  Key Connections was a mere instrumentality for the transaction of the Makeys' personal business involving Blue Bear.  The records of Key Connections produced to Plaintiffs in this matter indicate no other business activity.

Plaintiffs have settled their claims against Steve Short and Russell Disberger; the Donahoos filed for bankruptcy after this litigation was commenced; and Plaintiffs have obtained judgments against Mr. Karst and his related entities in excess of $7 million. Plaintiffs have also obtained a judgment against Key Connections in the amount of $161,036.24.   The claims remaining are those against the Makeys individually.

As owners of Blue Bear through their ownership in Key Connections and as organizers responsible for the creation and establishment of the business, the Makeys owed a fiduciary duty to the investors in the Blue Bear business scheme, including the Independent Factoring Companies ("IFCs") and individual investors, not to transfer any property or money to themselves or for their benefit to the detriment of such individuals.  They also owed a fiduciary duty to the investors not to perpetrate what should have been an apparent fraudulent scheme.

The Makeys and other parties, through Blue Bear, created approximately thirteen limited liability companies designed as IFCs each primarily with one member/manager known as an "Executive Director."  Under such mechanism, it was thought that each of the IFCs ostensibly could solicit thirty-five non-accredited investors and an unlimited number of accredited investors, and were thus exempt from

-4-

registration requirements under certain federal and state securities laws.  Each of the IFCs issued short term promissory notes to their investors.

For most of the time and with limited exceptions, the IFCs were not truly independent.  Blue Bear performed all of the tasks of the factoring and fundraising business and during all relevant periods, dominated and controlled the IFCs.  As part of the factoring business, Blue Bear found the Clients, purchased the Accounts, performed limited due diligence, established the IFCs, designated the Executive Directors, did all the accounting, co-mingled all of the investor and Client funds in one bank account, controlled the bank accounts of the IFCs, wrote all checks to the IFCs and their investors, did all of the paperwork, collected and enforced all Accounts in its own name and generally conducted the business as a single business enterprise.

At its inception, Blue Bear was inadequately capitalized with $100.  The documentation to set up the business was prepared by the Makeys and others and distributed to potential investors in the IFCs.  Individuals were solicited to invest their retirement and other funds in the IFCs with the expectation that an above market rate of return could be achieved on promissory notes issued by the IFCs.  The IFCs and Blue Bear, in turn, would make their money in the factoring business.  Investors were solicited to invest their funds based on the following false representations made or approved by the Makeys and Key Connections and others in the late 2003 or early 2004 time period: (1) that the principals of Blue Bear had performed adequate due diligence of potential and actual factoring and lending opportunities presented to the IFCs; (2) that most of the money to be invested would involve factoring through the purchase of

-5-

accounts receivable; (3) that payments on the receivables would be made directly to the IFCs; (4) that the IFCs would obtain blanket liens and personal guarantees in connection with factored accounts and loans; (5) that if funds were used for loans, the loans would be for a duration of 6 months or less, would include personal or corporate guarantees and be secured by deed of trust or first lien position in certain assets of the borrower or guarantor; (6) that Blue Bear would provide to the IFCs all back office operations including proper bookkeeping and accounting, audited financial reports, and preparation of reports on the IFCs performance; (7) that Blue Bear would process all paperwork on behalf of the IFCs in connection with the purchase of receivables or debt financing and that the paperwork would include title to the commercial paper as well as registration of security interests in collateral; (8) that a reserve for credit losses would be periodically reviewed for adequacy considering economic conditions, collateral values and credit quality indicators, including charge off experience, and levels of past due loans and non-performing assets; (9) that the costs of the private placement offering would only be paid out of the earnings of the IFCs; (10) that none of the money raised by the private placement offerings would be paid out as a commission or fee to any person; (11) that payments on Promissory Notes issued by the IFCs to investors would only be made out of revenue earned by the IFCs from Factoring and other debt financing; (12) that the books and records of first five IFCs had been audited as of November 1, 2003; and (13) that Blue Bear had credit risk management systems which were adequate to limit credit losses to a manageable level.

The Makeys and Key Connections knew or should have known that these representations were false or misleading and each of the investors and IFCs reasonably relied to their detriment on such representations in making their investment and continuing with their investment in the IFCs.

Over a period of months beginning in December of 2003, NCFS transferred certain of its loans and factoring assets to Blue Bear and/or the Initial IFCs and/or Blue Bear (the "Transferred Assets"). At the same time, many investors (and the debt owed by NCFS to such investors) were also transferred from NCFS to various IFCs (the "Transferred Debt"). Most of the Transferred Assets were non-performing loans. The Transferred Assets appear to have been placed on the books of Blue Bear at face value (i.e., at a value approximating the amount loaned or paid by NCFS). No attempt was made to actually value the Transferred Assets. Instead, the Transferred Assets were placed in the books of Blue Bear and the Initial IFCs at a value equal to the Transferred Debt (about $7,000,000). The Transferred Assets were placed in the books of Blue Bear before an adequate accounting system was in place and before investor/factoring client software packages were in place to track funds correctly.

When the NCFS transfers were completed sometime in the early part of 2004, Blue Bear had assets worth far less than $7,000,000 and liabilities greater than $7,000,000 in the form of obligations to the IFCs. In turn, the IFCs held assets in the form of obligations from Blue Bear worth far less than $7,000,000 while their total liabilities to creditors were greater than $7,000,000.

Thus, Blue Bear was insolvent from its inception and at all times thereafter. The Initial IFCs, being Empire Factoring, LLC; Return on Investment Capital, LLC; Willow Factoring, LLC; Provision Factoring, LLC; and HIS Factoring, LLC, were insolvent from inception. Due to the immediate insolvency of Blue Bear and the Initial IFCs, Blue Bear's member/managers including the Makeys and Key Connections had a heightened and direct duty to creditors, whose investments were in obvious peril from the outset. Funds eventually raised from investors totaled over $20,000,000.

No actual Accounts were ever transferred to any individual IFC. No payments were ever made directly to individual IFCs by Clients. No losses on Accounts were ever allocated to the IFCs. Few, if any, Clients even knew of the existence of the IFCs. All funds from investors, IFCs and Clients were commingled in Blue Bear's bank accounts. Funds from investors were used to pay fees and compensation to the Makeys and Key Connections. Notwithstanding the "factoring" purposes of Blue Bear and representations that investor funds would be used primarily for factoring, Blue Bear continued to make or acquire loans in addition to its factoring activities subsequent to the conveyance of the Transferred Assets.

From December 2003 to at least August of 2005, Blue Bear's revenues from the Transferred Assets and Blue Bear's subsequent investments (the "Additional Assets"), were wholly insufficient to make payments to vendors, IFCs, investors, and Blue Bear's owners including the Makeys and Key Connections. Investor funds were therefore used to make such payments. The Makeys, after inducing others to invest millions of dollars in Blue Bear, withdrew $100,000 from one IFC, Empire Factoring on March 8, 2004,

-8-

withdrew $22,484.63 from Empire Factoring on December 31, 2004 and withdrew $102,749.19 from another IFC, Return on Investment Capital, on March 7, 2005. These withdrawals, totaling almost $225,000.00, are in addition to the over $200,000.00 the Makeys took out of Blue Bear through Key Connections as discussed below.

Blue Bear, like NCFS, operated as a Ponzi scheme. In other words, Blue Bear was a fraudulent investment operation that paid returns to investors, Karst, Short, Disberger, Aspen, BBFI, the Donahoos and the Makeys and Key Connections out of the money raised from other investors, rather than from profits generated by any real business.

Thus, Blue Bear was established as an entity into which non-performing assets of NCFS could be dumped and fees paid to the organizers including the Makeys and Key Connections based on non-existent revenues and phantom profits. The Makeys, individually and through Key Connections, provided advice, counsel, and assistance in establishing the framework for the new business. They also established and/or reviewed the very contracts and agreements which provided to them the vehicles to loot assets of Blue Bear. The information provided to the IFCs and their investors to induce them to make their initial investments was false and misleading and was known or should have been known to be false and misleading by the Makeys and Key Connections. Once investments were made, the true financial condition of Blue Bear and its Assets were concealed from the IFCs and their investors at a time when the Makeys and Key Connections knew or should have known of such condition.

Key Connections provided services to Blue Bear under two separate arrangements. Initially, Key Connections entered into a certain Senior Consultants Agreement with Blue Bear effective December 1, 2003. Under such agreement, the primary role of Key Connections was generally to facilitate the transition of many investors in their investment groups from NCFS to Blue Bear/IFCs, monitor the investor services and recruit new investors. Key Connections received consideration of $5,000 per month, plus fees ranging from one percent (1%) to three percent (3%) of IFC earnings attributable to funding from investors introduced by them. This agreement terminated August 1, 2004.

Effective August 1, 2004, Key Connections entered into a Services Agreement with Blue Bear (the "Services Agreement"). Under this agreement, the primary role of Key Connections was to assist in the creation and overall operation of Blue Bear and in the provision of services to the IFCs. Specifically, Key Connections was, among other things, required to (a) contact legal counsel or others to establish Blue Bear and IFC guidelines, polices and procedures concerning various legal requirements; (b) assist Blue Bear's then management in finalizing Blue Bear's structure and strategizing the direction and future of the business; (c) establish new IFCs and identify prospective IFC Executive Directors; (d) support the IFCs in raising investor capital; and (e) act as a liaison between Blue Bear and the IFCs (the "Consulting Services"). Upon the effective date of the Services Agreements, Key Connections received five percent (5%) equity in Blue Bear as well as base monthly fees of $15,000. Although the agreement

was executed in September of 2004, Key Connections began receiving the $15,000 base monthly fees in August of 2004.

On or around December 2004, Blue Bear was having significant cash shortages and the IFCs were requesting financial statements from Blue Bear which they had never received. On or about January 26, 2005, Mr. John Davis became COO of Blue Bear. Soon after Mr. Davis became COO, he became concerned about certain operational and financial issues all of which were known or should have been known by the Makeys and Key Connections, but were concealed from the investors and IFCs, including the following:

A.     The Client files were incomplete, including a lack of information on Blue Bear's security interests or lien positions.

B.     The IFC monthly earnings statements prepared primarily by Mr. Karst on an accrual basis did not reconcile to the existing accounting records of Blue Bear.

C.     Some entries in the general ledger had no supporting documentation or explanation.

D.     The 2003 audit begun by Rulon had not yet been completed.

E.     Many major Accounts and loans were nonperforming.

F.     Blue Bear's internal financial statements were being prepared on an accrual basis of accounting. The lack of customer performance in the factoring and loan portfolios had created significant accruals of fees and interest (and related revenue) that were not collectible. The continual accrual of fees, interest and related

revenue with no adjustment for collectibility created a financial picture that was wildly distorted from reality.

       G.     All Blue Bear funds were being co-mingled in one bank account.

       H.     The IFC Executive Directors did not know what Accounts and loans they funded and to what extent.

As a result of these concerns, Mr. Davis took several immediate steps, including (a) instituting a cash method of accounting for revenue recognition beginning March 2005; (b) opening separate bank accounts for operating funds and payroll; and (c) instituting a procedure which required each IFC Executive Director to approve, in advance, specific Accounts for funding in all existing and new Clients.

After opening separate bank accounts, it became evident that Blue Bear was very cash poor. In early May 2005, Mr. Davis hired the accounting firm of Sample & Bailey, P.C. ("S&B"), to review and perform an audit of Blue Bear's books and records for 2003 and 2004. One area of immediate concern that emerged from S&B's investigations was that Blue Bear's 2004 financials needed to be restated on a cash basis. Specifically, Blue Bear had been accounting and operating using the accrual basis of accounting for recognition of revenue, notwithstanding the nature and reality of the business operations: namely, its Assets were either non-performing or greatly impaired and its cash flow was the typically erratic cash flow of a factoring company.

On or about March 2005, the IFCs were notified of the cash shortages, the need for restatement of the financial statements and the impaired or non-performing Assets.

The restatement of the financials was completed mid-July 2005, and revealed that Blue Bear had been paying investors, the IFCs, operating expenses and its members and the principals of its members as if every single Asset was producing income. Fees had been calculated and paid to the IFCs based on a fictional accrued number rather than actual cash collections. Interest was paid whether or not actual fees had been collected. No reserves had been taken for non-performing Assets. Non-performing Assets had been shown as accruing income rather than shifted to non-accrual. Blue Bear filed for bankruptcy in August of 2005.

Key Connections was aware of the inadequate accounting system that Blue Bear had and its inability to accurately report the true financial condition of Blue Bear and the IFCs. It was also aware of the inability of Blue Bear's accountants, Rickards, Long and Rulon to complete an audit of the financial statements of Blue Bear and the IFCs in 2004. Moreover, Key Connections knew monthly reports were sent to the IFCs indicating that the business was profitable when it was not. Despite knowing these things, during the one year preceding the Petition Date, Key Connections accepted the following payments from Blue Bear (the "Key Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 09/01/04 | 1460 | $ 5,000.00 |
| 09/01/04 | 1461 | $ 63.44 |
| 09/03/04 | 1479 | $ 20,000.00 |
| 09/23/04 | 1512 | $ 5,000.00 |
| 10/01/04 | 1521 | $ 15,000.00 |
| 11/01/04 | 1553 | $ 15,085.48 |
| 12/01/04 | 1594 | $ 15,005.32 |
| 12/30/04 | 1634 | $ 783.00 |
| 01/01/05 | 1645 | $ 15,000.00 |
| 01/14/05 | 1664 | $ 99.00 |
| 02/01/05 | 1691 | $ 15,000.00 |
| 03/01/05 | 993 | $ 15,000.00 |
| 04/01/05 | 1038 | $ 15,000.00 |
| 05/03/05 | 1069 | $ 15,000.00 |
| 07/01/05 | 1222 | $ 10,000.00 |
| | | $ 161,036.24 |

From January 5, 2004 through August 2, 2004, Key Connections received the

following payments from Blue Bear (the "Other Key Transfers"):

| Date | Check # | Amount |
|---|---|---|
| 1/5/04 | 1001 | $ 5,000.00 |
| 1/9/04 | 1011 | $ 193.05 |
| 2/5/04 | 1024 | $ |
| 2/6/04 | 1041 | 5,146.45 |
| | | $ 1,239.36 |
| 3/5/04 | 1062 | $ 5,000.00 |
| 3/11/04 | 1080 | $ 2,643.19 |
| 3/15/04 | 1092 | $ 30.55 |
| 4/1/04 | 1213 | $ 5,000.00 |
| 4/1/04 | 1214 | $ 2,544.67 |
| 4/21/04 | 1257 | $ 2,682.69 |
| 5/3/04 | 1259 | $ 5,103.66 |
| 5/20/04 | 1293 | $ 2,695.43 |
| 6/1/04 | 1306 | $ 5,000.00 |
| 7/1/04 | 1342 | $ 5,000.00 |
| 7/23/04 | 1373 | $ 3,254.33 |
| 8/1/04 | 1378 | $ 5,000.00 |
| 8/2/04 | 1401 | $ 1,460.10 |
| 8/2/04 | 1402 | $ 1,337.64 |
| 8/2/04 | 1403 | $ 777.92 |

-14-

| 8/2/04 | 1404 | $ | 538.56 |
|--------|------|---|--------|
| | | $ | 48,068.74 |

For the Key Transfers, Plaintiffs have already received a judgment against Key
Connections in the amount of $161,036.24.  At trial, Plaintiffs will present evidence to
pierce the corporate veil of Key Connections so that the judgment may be enforced
against the Makeys individually.  The remaining legal claims are: negligent
misrepresentation; breach of fiduciary duty; breach of contract and the implied duty of
good faith and fair dealing; and *quantum meruit*.

**B.**   **Defendants' Defenses**

Defendants have always acted in the best interest of the investors.  We have
never conspired to misrepresent any part of the investment to any potential or existing
investor.  We have never knowingly made false or misleading statements.  We have
always sought legal and accounting advice and pursued law enforcement intervention.
We never were signors on any of the company's bank accounts, and never participated
in identifying, evaluating or signing any agreements with the company's accounts.  We
were never members, owners or held any position in NCFS.  We never had any reason
to be concerned with NCFS and its compliance with securities laws.  The only concern
we had was with another investor group who had investments with NCFS.  We never
created a business to circumvent securities.  With the information we were given prior
to obtaining access to the financials of the company, we never had any reason to believe
the company was insolvent.  Upon access to the financials and identifying an apparent
misappropriation of company profits, we were the ones that initiated the first steps in

-15-

the best interest of the company. We, as owners, initiated hiring new legal counsel to represent the company upon learning the company's current legal counsel had begun the process of starting his own independent factoring company and the potential conflict of interest this would create. We also participated in the hiring of the legal firm that represented the company prior to and after its filing for bankruptcy as well as followed their counsel. At the request of the company's management and legal counsel, we continued to work with the company in efforts at identifying other potential areas of concern. Prior to and following this request, we discontinued taking any compensation for our efforts with the exception of one payment which management insisted we take. Upon the company's management request, we continued to meet with them after the bankruptcy was filed to discuss the status of the company, potential new accounts, potential new investors and the status of the bankruptcy.

### 4.    Stipulated and Uncontested Facts

A.    The Makeys were introduced to David Karst in the fall/winter of 2000.

B.    The Makeys were members and record keepers of an investment club known as Capital Growth Management, LLC.

C.    Both Vicky Dix & Tad Borrett were Executive Directors of their own independent factoring companies with servicing agreements with 1st American Factoring, LLC a/k/a/ Blue Bear Funding, LLC.

D.    In May 2003, the Makeys consulted with attorney Steve Segal, who specialized in securities law, regarding investment clubs.

E.  In approximately May-July 2003, the Makeys met Karl Dakin, attorney, Russell Disberger, business consultant, and Virginia Brinkman, business assistant, all of which were working with Darin DeVoe on his business model.

F.  In approximately September-October 2003, the Makeys attended meetings at Christ Center Community Church in Fort Collins, Colorado where potential Executive Directors of Independent Factoring Companies were presented information regarding becoming Executive Directors of Independent Factoring Companies.

G.  In approximately January-February 2005, Frank Clarke resigned and was replaced by John Davis as COO of Blue Bear Funding, LLC.

H.  On March 10, 2005, the Makeys, Donahooo's and Karst filed a report with the Windsor Police Department regarding the misappropriation of funds by Blue Bear Financial, Inc.

I.  In July 2005, Sample & Bailey stated they would not be able to provide an audit but only a review of the financials.

J.  In July 2005, as investors in IFC Empire Factoring, LLC, the Makeys received a letter dated June 30, 2005, from Reed Gilmore discussing the potential impaired accounts and informed the Makeys to contact him, John Davis or Dave Karst if we had any questions.

K.  On August 2, 2005, a meeting was held with the BBF owners, Davis, Segal and associates and Doug Jessop to review the situation and evaluate the options going forward.

-17-

L.   On August 11, 2005, BBF sent a disclosure to the IFCs who in turn were directed to forward it to their investors, regarding the possibility of BBF bankruptcy.

M.   Based on counsel the Makeys received from Jessop & Company, Key Connections, LLC assigned its ownership voting rights to Davis.

N.   On October 25, 2005, a Proof Claim was recorded in US Bankruptcy Court for Gerald W. Makey for $38,708.66 and Peggy A. Makey for $38,715.47.

O.   The Makeys received a letter dated October 11, 2006, from Pelican Financial Services, Inc. stating they would become shareholders in the new company. The Makeys are shareholders in Pelican Financial Services, Inc. with a total of $77,424.13 invested, Peggy Makey with $38,715.47 and Gerald Makey with $38,708.66.

P.   The Makeys' Proofs of Claims have never been disallowed.

### 5.   Areas of Factual Dispute

**Plaintiffs:** There does not appear to be any agreement between the parties regarding factual issues, other than the facts listed above in Section 4, and the amount of monies received by the Makeys during the course of Blue Bear's business. For a detailed listing of material factual disputes, *see* Section 6 below.

**Defendants:** Defendants' proposed Areas of Factual Dispute are as follows:

A.   The Makeys always acted in the best interest of the investors.

B.   The Makeys never conspired to misrepresent any part of this investment to any potential or existing investor.

C.      The Makeys never knowingly made material false or misleading statements.

D.      The Makeys have never been members or owners of any of Karst's entities.

E.      The Makeys consulted with Mark Carson CPA/Attorney, May/June 2002.

F.      The Makeys never lead, managed or brokered any investor group.

G.      The Makeys were members and record keepers of an Investment Club – Capital Growth Management, LLC, June 2002.

H.      The Makeys consulted with Mark Carson CPA/Attorney, January 2003.

I.      Capital Growth Management Investment Club was not a key investor group in NCFS with only approximately $1,200,000.00 invested.

J.      There were at least 4 investor groups in NCFS that were larger, one of which Vicky Dix was the servicing agent for, Quadrant Investments, LLC and one of which Tad Borrett was the co-servicing agent of, H20, LLC.

K.      May 2003 Darin DeVoe contacted the Makeys regarding participating in a business model consisting of several businesses including a factoring company.

L.      June 13, 2003 the Makeys and Donahoos were invited to sit in on a meeting where John Eckstein and Kathleen Gormley, Securities Attorneys of Fairfield & Woods, Karl Dakin, Darin DeVoe and Russell Disberger discussed securities rules and regulations.

M.      Early October 2003 Disberger presented the Makeys with a business structure which they were told had been created and approved by several attorneys,

including attorneys specializing in securities law, for 1st American Factoring later known as Blue Bear Funding, LLC.

     N.     Blue Bear Funding, LLC was a support services company providing services for Independent Factoring Companies.

     O.     The Makeys never had any part in the capitalization of 1st American Factoring, LLC later know as Blue Bear Funding, LLC.

     P.     The Makeys never participated in the formation or production of 1st American Factoring, LLC or its documents.

     Q.     The Makeys role was that of information liaisons between 1st American Factoring, LLC later known as Blue Bear Funding, LLC and the Independent Factoring Companies Executive Directors.

     R.     October 2003 the Makeys attended a meeting at Bethel Lutheran Church in Windsor, Colorado where Dakin, Disberger and Karst, presented the business structure to them and members of the investments clubs stating that the structure had been created, reviewed and approved by 4-5 attorneys, some of which specialized in SEC law. Dakin, Disberger and Karst explained how the factoring accounts were secured (by assets of the factored company and its owner), the historic bad debt percentage of Karst at NCFS (2% - 4%) and that the structure was setup in compliance with SEC guidelines for security and long term investment opportunity.  Investment club members were introduced to the IFC executive directors so they could meet them if they were interested in participating in the new structure.

S.      November 2003 Private Placement Memorandums (PPMs) were created by Karl Dakin for the IFCs.  Everyone involved was told the PPMs had been reviewed and approved by attorneys specializing in securities law.

T.      November 2003 Vicky Dix, executive director of ROIC, LLC, retained Jeff Bartholomew, attorney specializing in securities law, to review and approve her PPM.

U.      Potential investors were given the opportunity to have the PPM reviewed by their      own legal counsel and/or accountant prior to subscribing to any IFC.

V.      As servicing agents for the investment club which the Makeys were members of,  the Makeys facilitated the paperwork necessary for the members to close their membership in the investment clubs.  Members choosing not to invest into an IFC had their investment funds paid out in full.

W.      Mid 2004 the Makeys learned during negotiating Key Connections, LLC servicing agreements, from Disberger that he was not only a hired business consultant to setup and manage 1st American Factoring but he was also part majority owner with Short and DeVoe of 1st American Factoring, LLC.  During this same time we learned from Short that DeVoe never held ownership in 1st American Factoring, LLC and that the owners of 1st American Factoring, LLC were himself, Disberger as 50% owners and Karst as 50% owner.

X.      December 2003, BBF began offering third party support services to IFCs. IFC directors were presented opportunity statements by Karst and made decisions on their own regarding investment into those opportunities.  The Makeys did not have

anything to do with the due diligence of the opportunities presented or the decision made by the IFC directors.

Y.    December 2003, the initial $7.7 million of investment funds into the new IFC was from members of the investment clubs, including clubs serviced by Vicky Dix and Tad Borrett, new IFC executive directors.

Z.    The Makeys along with the Donahoos and Executive Directors were told that due diligence had been done by Karst and Disberger on the initial accounts transferred from NCFS. There was no mention to anyone of any loans in the portfolio nor of any non-performing accounts.

AA.    November/December 2004 was the first time the Makeys were made aware of three accounts that had been transferred that were impaired. Frank Clarke, CFO informed us of the accounts.

BB.    Disberger, as manager of BBF, was responsible for setting up the management policies, accounting systems, factoring tracking systems and IFC investor tracking systems. Disberger never did setup the system for IFC investor tracking so the system used in the investment clubs was modified and utilized for this purpose.

CC.    Dakin, Disberger, Short and Karst developed and implemented all of the policies and procedures for the administration of the IFC investor accounts.

DD.    Makeys accounting responsibilities were those of bookkeeping as it related only to the IFC investor accounts. This included the processing of monthly statements of investor account balances and creating and updating IFC investor files as directed by the IFC directors.

EE.    January 2004 through September 2004, 1st American Factoring changed its name to Blue Bear Funding, LLC.  The Makeys role was as liaisons between BBF and the IFC executive directors.  Karst was the executive director and Disberger was the manager.  Early in 2004 we learned that Steve Short was an absentee owner.  His role was development, review and finalization of all organizational and management documents for BBF.  Dakin was the attorney who created the PPMs and all legal documents for the IFCs.  He reviewed, revised and approved all the policies and procedures that were used for tracking and documenting IFC investor funds and requests.

FF.    From January 2004 the Makeys' role as independent consultants to BBF included: (a) Completing background checks through Kroll Factual Data on all IFC directors, BBF employees and Blue Bear ownership; (b) Taking the information provided by Karst, Disberger, Short and Dakin and using it to draft IFC documents, forms, marketing material, Power Point presentations, etc. Prior to implementing, all material was reviewed and approved by Karst, Disberger, Short and Dakin; (c) At the request of the IFC directors, hosted information sessions where potential investors invited by the IFC directors would be given general information about factoring. During the presentations the information given was that which was in the PPMs provided by Karl Dakin; (d) Hosted IFC executive director update meetings where they had the opportunity to ask questions of Karst, Disberger, Short and Dakin; (e) Met weekly with BBF management to receive updates on the status of BBF, updates on current and future clients and the due diligence that was being performed.  This

-23-

information was then passed onto the IFC executive directors; (f) Process monthly statements for the IFC executive directors for their investors; (g) Create and update IFC investor files when requested by the IFC executive directors.

GG.   In their role as independent consultants to BBF the Makeys:

    a.   Never signed checks for BBF or any of the IFCs.

    b.   Never had access to BBF or IFC bank accounts.

    c.   Never performed any due diligence on factoring accounts.

    d.   Never acted or participated in the Investment Committee.

    e.   Never negotiated or assisted in the negotiations of any factoring accounts.

    f.   Never signed factoring contracts or Bills of Sale.

    g.   Never made hiring decisions or signed employment contracts for BBF.

    h.   Never had access to the accounting or factoring tracking software.

    i.   Never met with Scott Rulon or his associates or had any part of developing the initial financial audit placed in the PPMs.

    j.   Never had any responsibility toward the completion of the yearly audit by Rulon or any other accounting firm.

    k.   Never recruited new investors.

    l.   Never had a vote in any decisions made by BBF until we received our 5% ownership in September 2004.

    m.    Never had access to the accounting program of BBF until January 2005.

    n.    Never received any ownership profit from BBF. The only compensation the Makeys received was the amounts agreed upon in their support services agreements.

HH.    September 2004 through January 2005, the Makeys learned via weekly update meetings that BBF was solvent and ready for growth. Disberger, Short and Karst presented the company's goals that included bringing in a sales person to assist Karst, bringing a CFO and hiring an administrative assistant.

II.    The Makeys retained Jon-Mark Patterson to help them negotiate a new independent consultant services agreement. This was due to the inability of Disberger to accurately determine their monthly compensation. The Makeys wanted a clearly defined agreement and wanted to receive the ownership position originally promised to them by DeVoe.

JJ.    September 16, 2004 Key Connections, LLC, whom the Makeys were members, signed a new service agreement with BBF at which time it received its ownership position. At that time Disberger informed us that, based on the company's estimated current value, our 5% ownership would equate to approximately $250,000.00 and that we may want to consult with our accountant regarding potential tax planning.

KK.    Russell Disberger showed the Makeys a spreadsheet indicating the net income for BBF at this time was in excess of $1M and were told it was projected to be at least $2M by the end of 2004.

-25-

LL.   Phil Wilgers, IHS, LLC Executive Director questioned Disberger about Ponzi schemes prompting Disberger to circulate an article on the story of Charles Ponzi. At that time it was explained to the Makeys that in a Ponzi scheme there is no underlying business where in contrast 1st American Factoring, LLC, later known as Blue Bear Funding, LLC, had an underlying business, that being factoring, with active accounts.

MM.   Frank Clarke gave the Makeys a spreadsheet in September 2004 again showing the net income of BBF to be well over $1M and showing the company was very solvent.

NN.   Karl Dakin created the 2nd round PPM for the IFC's second offering to be implemented in November 2004.

OO.   Karl Dakin had started his own independent factoring company and presented BBF with his PPM and requested BBF be his servicing company.  This created a conflict of interest between him and BBF due to the fact he was legal counsel for BBF.

PP.   The Makeys requested Segal review all documents the IFC's were using.

QQ.   Upon review of the 2nd round PPM Segal determined it would violate SEC regulations and could not be implemented.

RR.   November 2, 2004 during a recorded conference call with Dakin, Segal, Disberger, the Makeys & Kris Donahoo it was announced by Dakin & Disberger that the Company structure under which the IFC's and BBF had been operating had never been reviewed by any SEC council as we all had been told.

SS.    The only review of the PPM was by Vicky Dix's attorney Jeff Bartholomew, who specialized in SEC law.

TT.    There were four groups, Allen & Kaleen Peipho, Jon Voyles, Dan Harty and Karl Dakin wanting to sign factoring services agreements with BBF.

UU.    The Makeys and the Donahoos made the decision not to provide services to the Peipho's, Jon Voyles, Dan Harty or Karl Dakin until a thorough review of the documents had been completed.

VV.    The IFC's retained Steve Segal and his associate Eric Martin to revise and extend their current PPM and revise all the documents they had been using for their investors.

WW.    Disberger and Karst were pressuring the Makeys and Donahoos to get the four pending IFCs started. These companies had approximately $10M in investor funds they wanted BBF to factor for them. The Makeys and Donahoos refused due to the fact the attorneys had not yet completed the review of the documents for BBF or revising the IFC documents.

XX.    December 2004 Clarke informed the Makeys that there were three accounts that were part of the original portfolio that might be impaired.

YY.    Since Key Connections, LLC ownership had been granted the Makeys asked repeatedly to participate in BBF Investment Committee meetings.  The Makeys were never informed of the meeting times & places.

ZZ.    The Makeys asked repeatedly for access to the PeachTree accounting system so they could review the detailed financials of BBF.